# NORTHERN PACIFIC RAILROAD COMPANY *v.* CLARK.

## CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 1045. Argued April 12, 1894. — Decided April 30, 1894.

No one can be permitted to go into a court of equity to enjoin the collection of a tax, until he has shown himself entitled to the aid of the court by paying so much of the tax assessed against him as it can be plainly seen he ought to pay.

*State Railroad Tax Cases,* 92 U. S. 575, and *National Bank v. Kimball,* 103 U. S. 732, affirmed and followed on this point.

The Northern Pacific Railroad Company, having accepted the provisions of the act of Dakota of March 7, 1889, c. 107, became liable thereby to pay

the designated percentage of its gross earnings in lieu of taxes for the year 1889, which liability was not discharged by the subsequent repeal of the gross earnings act of 1889; and, having failed to make that payment, or to make a tender of what was due under one or the other modes of taxation, it is not entitled to relief in equity to enjoin the enforcement of a tax upon its property as upon the property of individuals in the counties in which the property is situated.

THIS case, under the style of the *Northern Pacific Railroad Company* v. *Walker*, 148 U. S. 391, was before this court at October term, 1892, and the jurisdiction of the Circuit Court not appearing upon the face of the record, it was remanded with leave to amend. The appellant accordingly, on June 6, 1893, filed in the Circuit Court of the United States for the District of North Dakota its amended bill of complaint, in which, after setting forth its creation and organization under and by virtue of an act of Congress approved July 2, 1864, c. 217, 13 Stat. 365, entitled, "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's Sound on the Pacific Coast by the northern route," and certain acts and joint resolutions of Congress supplementary thereto and amendatory thereof, it was alleged that for the purposes of laying out, locating, constructing, furnishing, and maintaining a railroad and the telegraph line between the points indicated there was granted to it by Congress every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of the railroad line as the company might adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of the railroad line whenever it passed through any State, to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, free from preëmption or all other claims at the time the line of the railroad should be definitely fixed, and the plat thereof be filed with the Commissioner of the General Land Office; that the railroad company duly accepted the terms, conditions, and impositions of said act of Congress, and that on the respective dates of May 26, 1873, and July 20, 1880, it definitely fixed the line of its railroad

through certain counties in the Territory of Dakota, (now the State of North Dakota,) and filed plats thereof in the office of the Commissioner of the General Land Office; that the line of railroad so fixed extends opposite to and past the lands set forth and described in the schedules made a part of the bill; that prior to December 20, 1880, it had completed that portion of the railroad and telegraph line extending on, over, and along the line of definite location of the railroad, and that the President of the United States, from time to time, after the same had been examined by commissioners, had accepted the railroad and telegraph line as having been constructed and completed in all respects as required by the act of July 2, 1864, and the acts and joint resolutions supplementary and amendatory thereof.

The bill further alleged that the lands on each side of the railroad, and every portion thereof, were within forty miles of the company's line of road so definitely fixed; that they were public lands to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and no entry or application to make entry for the lands was made or was pending when the lists of definite location were filed in the office of the Commissioner of the General Land Office on May 26, 1873, and July 20, 1880; that the described lands had been surveyed by United States surveyors, and had been reported to be agricultural in their character and non-mineral; and that the lands were not, on July 2, 1864, or May 26, 1873, and July 20, 1880, known as mineral lands, etc.; that the company had prior to the year 1889, in accordance with the direction of the Secretary of the Interior, duly prepared and filed lists in the United States land offices in the land districts in which the lands were situated respectively, describing the lands and claiming them as a portion enuring to it under and by virtue of the act of Congress approved July 2, 1864, which lists were duly allowed and approved by the United States district land officers, to whom the fees prescribed by law were paid by the company, and which were retained by the United States; that the lists of lands so filed were duly transmitted by the district land officers to the Commissioner of the General Land Office

for his approval; that since the lists were filed and transmitted to the Commissioner of the General Land Office, the Commissioner, under the direction of the Secretary of the Interior, had required the company to file in the office of the Commissioner, or in the office of the land office districts in which the lands were respectively situated, an affidavit made by some person acquainted with the character of the lands, setting forth and showing that the same were non-mineral, and that until such affidavits had been filed the Commissioner refused to approve the lists; that the company had not, nor had any one in its behalf, filed affidavits of persons having knowledge of the mineral or non-mineral character of the lands set out in the lists.

The bill then proceeds to state that none of the lands described had ever been certified or patented to the railroad company, and that neither the United States, nor any of its officers or agents, had ever ascertained and determined what specific lands in the State of North Dakota passed to the railroad company by virtue of the act of July 2, 1864, although the railroad company had repeatedly petitioned to have this done; that the United States and its officers had refused to certify to the company the lands described in the schedules of the bill, but held the lists suspended and unapproved upon the claim that the lands may be mineral in character, and as such excepted from the grant to the company, or that the lands may not have been free from claims or rights reserved in the grant, or that the question as to whether title to the lands had passed to the railroad company under and by virtue of the granting act, and acts amendatory thereof; that said matters were still in controversy, and pending before the commissioner of the General Land Office and the Secretary of the Interior.

It is further alleged that the railroad company had no other right, title, claim, interest, property, or possession in or to any of the lands or premises described in the bill except such right, title, claim, interest, property, or possession as it may have obtained under and by virtue of the acts and resolutions of Congress, and its compliance with the conditions thereof.

It is then averred that on March 7, 1889, the legislature of

the Territory of Dakota passed an act, which was duly approved by the governor of the Territory, entitled "An act providing for the levy and collection of taxes upon the property of railroad companies in this Territory," in and by which it was, among other things, enacted and provided: "In lieu of any and all other taxes upon any railroads, except railroads operated by horse power, within this Territory, or upon the equipment, appurtenances, or appendages thereof, or upon any other property situated within this Territory belonging to the corporation owning or operating such railroads, upon the capital stock, or business transactions of said railroad company, there shall hereafter be paid into the treasury of this Territory an amount equal to a percentage of all the gross earnings of the corporation owning or operating such railroad arising from the operation of such railroad as shall be situated within this Territory, both upon territorial and interstate traffic, in case the railroad company owning or operating such line shall accept and become subject to this act as hereinafter provided," Laws of Dakota, 1889, c. 107, p. 134; that the railroad company did, within thirty days after the passage of this act, by resolution of its board of directors, attested by its secretary, filed with the secretary of the Territory of Dakota, accept and become subject to the provisions of the act of March 7, 1889; that within thirty days of its passage the railroad company, as required by the act, prepared and filed with the treasurer of the Territory, in the manner required by the provisions of chapter 99 of the Session Laws of the Territory for the year 1883, an account of the gross earnings of the company, both territorial and interstate, for the years 1886 and 1887, and paid into the treasury the entire amount of taxes claimed by the Territory on local and interstate earnings remaining unpaid at the time of filing such account for said years, such payment being as follows, to wit: For the last half of the year 1886, $38,095.31; for the year 1887, $65,585.46. Such sums so paid, as provided for in the territorial act of March 7, 1889, were percentages computed entirely upon gross earnings of the company derived from domestic business, the percentage for the same years computed upon the gross earnings derived from

interstate business having been previously paid by the company as required by the provisions of the territorial act of 1883.

It was also alleged that, at the same time, the company paid into the treasury of the Territory one-half of the entire amount due for the year 1888, amounting to $46,937.09, and that before August 15, 1889, it had paid the remainder of the amount due for the year 1888; that the sums so paid into the treasury for the year 1888 were percentages computed upon the gross earnings of the company for that year, derived from both domestic and interstate business, the former amounting to $11,446.78 and the latter to $82,427.40, and it was alleged that all the percentages derived from interstate business so paid into the treasury were not due from the company, except by virtue of the act of March 7, 1889, and the company's acceptance thereof, and that they were paid as a consideration for the exemption from taxation provided for by that act, and for no other reason.

It is then charged that, notwithstanding the premises, in the year 1889 the county auditors for the counties of Kidder, Stutsman, Richland, and McLean, under the authority of the laws of the Territory of Dakota, had assessed the company's lands situate in their respective counties for purposes of county taxation, and that they had advertised the lands as described in the schedules to the bill, for sale, and were about to wrongfully sell the same for the non-payment of taxes so levied, together with penalties and costs, and to issue certificates of sale for the same in the form prescribed by the laws of North Dakota, and unless restrained by the order of the court they would sell the lands, and issue certificates of sale thereafter, whereby the rights of the railroad company in and to the lands would be irreparably injured, and lead to a multiplicity of suits concerning the title thereto.

It was further claimed on the part of the railroad company that the taxes so assessed and levied upon the lands were a cloud upon the title of the railroad company thereto; that if sold and certificates were issued to the purchaser, such certificates would constitute a cloud upon the title of the company in and to the lands so sold; that the counties were bankrupt,

and that if the railroad company should pay the taxes and then bring an action against them to recover the amount thereof, it would require a multiplicity of suits, and such judgments as might be recovered would be worthless.

The bill further averred that the amount of the taxes levied upon the lands, together with the costs and penalties claimed by the county auditors to have accrued thereon, and for which the lands had been advertised for sale, and were about to be sold, were as follows: Upon the lands in Kidder County, $12,820.67; upon the lands in Stutsman County, $8863.39; upon the lands in Richland County, $4094.37; and upon the lands in McLean County, $4048.17 — the amount of such tax, penalty, and cost upon each tract of land being particularly shown in the schedules attached to the bill.

The prayer of the bill was to the effect that the county assessments and taxes so levied upon the lands of the railroad company might be declared illegal and void, and a cloud upon the title of the company, and that the defendants, and each of them, their deputies and successors in office, be restrained from selling or attempting to sell the lands or any portion thereof, or from issuing tax certificates therefor.

The defendants appeared and demurred to the amended bill on the ground that, according to the showing made therein, the plaintiff was not entitled to the relief sought. The Circuit Court sustained the demurrer and dismissed the bill on the ground that the act of 1889 was void, because it violated the organic act, which provided that the legislative assembly of the Territory shall not make any discrimination in taxing different kinds of property, but all property subject to taxation shall be taxed in proportion to its value; secondly, that the bill was without equity in failing to allege payment or tender of the gross earnings tax for the year 1889. 47 Fed. Rep. 681.

From this judgment the railroad company appealed to the United States Circuit Court of Appeals for the Eighth Circuit, and that court, desiring instructions upon certain questions presented by the assignments of error filed in the cause, certified to this court various propositions of law, as to

whether the railroad company acquired such title to the odd-numbered sections of land within the place limits of the grant of July 2, 1864, which were not mineral, and which, at the dates of the grant and of the filing of the map of definite location in the office of the Commissioner of the General Land Office, were not reserved, sold, granted, or otherwise appropriated, as to render them taxable before being patented and certified to the railroad company; whether the company was taxable on such lands by the Territories after the filing of the map of definite location of its railroad, and full compliance with the terms and conditions of the granting act, while the United States refused to patent and certify such lands to the company; whether chapter 107 of the Laws of Dakota for 1889, being an act entitled "An act providing for the levying and collection of taxes upon the properties of railroad companies in this Territory," approved March 7, 1889, was void as a regulation of interstate commerce; whether the act of March 7, 1889, was in conflict with the Fifth and Fourteenth Amendments of the Constitution of the United States, and with the organic law of the Territory, as an attempt to exempt from taxation the lands granted by the act of July 2, 1864; whether the act of March 7, 1889, should be construed as granting an exemption for the year 1889, or to be in force and effect only after the year 1890. The eighth and remaining question certified is as follows: "Is said bill without equity because of the failure to aver that the complainant has tendered or paid the 'gross earnings tax' for the year 1889; and is said complainant entitled to the equitable relief prayed without first tendering or paying such tax?"

*Mr. F. M. Dudley,* for appellant, with regard to this eighth question said:

Is said bill without equity because of the failure to aver that the complainant has tendered or paid the "gross earnings tax" for the year 1889; and is said complainant entitled to the equitable relief prayed without first tendering or paying such tax?

I. In the discussion of the propositions arising under this question, the constitutionality of the "gross earnings law" is, necessarily, conceded, but while admitting the constitutionality of the exemption, appellees deny the right of the company to claim the benefit thereof until the gross earnings percentage money is paid. It is an attempt to apply the familiar rule that he who seeks equity must do equity.

The limitation of the rule is that the amount to be paid as a condition precedent to invoking the aid of a court of equity is the amount conceded to be due, or what can be seen to be due on the face of the bill, or be shown by affidavits, whether conceded or not. The State is not to be tied up as to that of which there is no contest, by lumping it with that which is really contested. *State Railroad Tax Cases*, 92 U. S. 575, 617.

II. The exemption from assessment and levy of taxes in the ordinary manner, made by the "gross earnings law," did not depend upon the payment of the three per centum of the gross earnings in the first instance, but upon the filing with the secretary of the Territory of a resolution adopted by the railroad company and attested by its secretary, accepting the provisions of the act and subjecting the corporation to its terms. Immediately upon such action being taken by a railroad company which had qualified itself to accept the act by filing an account of the earnings under the act of 1883, and paying all percentages then due upon both interstate and territorial earnings as claimed by the Territory, the exemption became effective. The liability of the railroad company to pay the percentage upon its gross earnings, by virtue of its acceptance of the act, rather than the actual payment, was the consideration upon which the exemption became effective.

By the "gross earnings act" the Territory was given a lien upon the railroad of the company, and upon all property, estate, or effects of the company, real or mixed, to secure the payment of the per centum, and such lien took precedence of all demands, decrees, and judgments against said company. By the fourth section of the act, the territorial treasurer was

authorized to distrain and sell sufficient property to pay the amount due from the corporation in case of its failure to pay such amount when due, or within thirty days thereafter. This remedy, given in the "gross earnings act" itself, was an exclusive remedy. And since the exemption by the "gross earnings act" is necessarily perfect upon the acceptance of the act, and nearly a year prior to the time when the first payment of the per centum is required, and is founded, not upon the actual payment, but upon the liability to pay, it is evident that the failure to make such payment cannot be a more material factor in considering appellant's equitable right to an injunction restraining the sale than it would where the ground of exemption is the interest of the government in the lands. The material question is the exemption. If that exist the ground upon which it is founded, so long as it is not the actual payment of the per centum, is immaterial. Conceding the exemption, the right to the equitable relief cannot be questioned.

Since the failure to pay the "gross earnings" per centum would not give the counties the right to tax these lands as other lands are taxed, it is not essential to negative such failure in the bill of complaint; and no inference can be drawn from the absence of an averment, that no such payment has been made; and that portion of the opinion of the Circuit Court, holding that there is no equity in complainant's bill, is founded upon an assumed fact that is not in the record.

III. There was, and is, no "gross earnings" percentage due, and there is no one authorized to receive such money.

Long prior to the time any payments became due under the act for the year 1889, it was repealed. No part of the "gross earnings" percentage for 1889 became payable until 1890, as prior to that time no report of the gross earnings of the company for that year could be made. Prior to that time, and on October 1, 1889, the constitution of the State of North Dakota was adopted. Under this constitution, November 2, 1889, North Dakota was declared admitted to the Union by proclamation of the President. 26 Stat. 1548.

It is apparent from the provisions of this constitution which

are printed in the margin [1] that the power to pass a gross earnings law exempting the lands granted to the company was withheld from the legislature. The gross earnings law of 1889 was therefore repealed by the adoption of the constitution, as repugnant to it.

The law is well settled that when a statute is repealed it must be considered (except as to transactions passed and closed) as if it had never existed. The authority of an officer to act thereunder terminates with the repeal, unless the right so to act is especially saved in the repealing act. Where a statute requires a certain tax to be collected and the act is repealed before the collection is made, or the tax due, the right to make such collection is gone. *Bleidorn* v. *Abel*, 6 Iowa, 5; *Van Inwagen* v. *Chicago*, 61 Illinois, 31; *The Marion Township Road Co.* v. *Sleeth*, 53 Indiana, 35; *Commonwealth* v. *Standard. Oil Co.*, 101 Penn. St. 119; *St.*

---

[1] Section 2 of the schedule of the constitution provides: "All laws now in force in the Territory of Dakota which are not repugnant to this constitution, shall remain in force until they expire by their own limitations or be altered or repealed."

Section 176 of article XI. thereof provides: " . . . But the legislative assembly may, by law, provide for the payment of a per centum of gross earnings of railroad companies to be paid in lieu of all state, county, township and school taxes on property exclusively used in and about the prosecution of the business of such companies as common carriers, but no real estate of such corporation shall be exempted from taxation in the same manner, and on the same basis as other real estate is taxed, except road-bed, right of way, shops and buildings used exclusively in their business as common carriers, and whenever and so long as such law providing for the payment of a per centum on earnings shall be in force, that part of section 179 of this article relating to assessment of railroad property shall cease to be in force."

Section 179 of said article is as follows: "All property, except as hereinafter in this section provided, shall be assessed in the county, city, township, town, village or district in which it is situated, in the manner prescribed by law. The franchise, roadway, road-bed, rails and rolling stock of all railroads operated in this State shall be assessed by the state board of equalization at their actual value, and such assessed valuation shall be apportioned to the counties, cities, towns, townships and districts in which said roads are located, as a basis for taxation of such property in proportion to the number of miles of railway laid in such counties, cities, towns, townships, and districts."

*Joseph's County* v. *Ruckman,* 57 Indiana, 96; *Bennet* v. *Hargus,* 1 Nebraska, 419; *Butler* v. *Palmer,* 1 Hill. 324.

IV. A valuable consideration for the exemption from taxation was, in fact, given by the railroad company and accepted and retained by the State.

The gross earnings law of 1889 is an offer on the part of the Territory to make a contract with any railroad company by the terms of which the company obligates itself to pay to the Territory a certain percentage of the company's gross earnings, and the Territory, in consideration of such obligation, agrees to exempt from any and all other taxation the property of the company. The tax law of 1883, which was in force prior to that, was accepted by the Northern Pacific Company, and taxes were paid in accordance with it up to 1887. By the second section of the act of Congress of July 2, 1864, incorporating complainant, it is provided that "the right of way shall be exempt from taxation within the Territories of the United States." This exemption from taxation includes all buildings, superstructures, etc., that were attached to the soil of such right of way. *Northern Pacific Railroad* v. *Carland,* 5 Montana, 146. Under the provisions of the act of Congress approved July 15, 1870, 16 Stat. 291, the lands granted to the Northern Pacific Railroad Company could not be taxed until the company had paid "into the treasury of the United States the cost of surveying, selecting and conveying" the lands granted to the company. The railroad company did not, prior to 1887, pay such fees upon lands owned by it, and hence its lands were not taxable. *Northern Pacific Railroad* v. *Traill County,* 115 U. S. 600. In 1887 its lands became taxable, under the operation of the act of July 10, 1886, c. 764, 24 Stat. 143.

*Mr. Edgar W. Camp,* (with whom was *Mr. S. L. Glaspell* on the brief,) for appellees. *Mr. W. H. Standish* filed a brief for the county auditor of Kidder County, appellee.

MR. JUSTICE JACKSON, after stating the case, delivered the opinion of the court.

In the view we take of the case, the answer to the last question will dispose of the suit, and render it unnecessary to enter upon the consideration and determination of the other propositions of law on which instructions are asked.

By an act of the legislature of the Territory, approved March 9, 1883, c. 99, Laws of 1883, it was provided that all railroad companies, except railroads operated by horse power, owned and operated within the Territory, should pay two per centum on the gross earnings of their railroads for a period of five years, and thereafter three per centum on the gross earnings, in lieu of all other taxes upon said railroads and the capital stock and business thereof. The payment of this percentage was to be made at designated dates in each year, and penalties were imposed upon the companies failing to comply with the provisions of the law as to the making of returns of earnings and paying the percentages imposed by the act. The moneys so received and collected were to be apportioned between the Territory and the several counties through which the railroads respectively ran.

This act of 1883 left the railroad companies no choice as to whether they would pay the designated percentage on their gross earnings, or remain subject to taxation upon their property in the ordinary method. It was compulsory upon them. It is not material to the present case to consider whether this act was constitutional or not; it was repealed by the act of the legislature approved January 29, 1889. Now, it is shown by the bill that at the time the act of 1883 was repealed the appellant was in default of the payment of the percentages due upon its gross earnings for the years 1886, 1887, and 1888.

On March 7, 1889, the legislature of the Territory of Dakota passed the act, entitled "An act providing for the levy and collection of taxes upon property of railroad companies in this Territory,"[1] which went into force and effect immediately after its passage.

---

[1] *Be it enacted by the Legislative Assembly of the Territory of Dakota:*

1. *Percentage of gross earnings to be paid in lieu of other taxes.*— In lieu of any and all other taxes upon any railroads, except railroads operated by horse power, within this Territory, or upon the equipment, appurtenances,

This act is by its terms nothing but a tax law, and while it adopted the same rule of percentages on the gross earnings as

---

or appendages thereof, or upon any other property situated in this Territory belonging to the corporation owning or operating such railroads, upon the capital stock or business transactions of said railroad company, there shall hereafter be paid into the treasury of this Territory an amount equal to a percentage of all the gross earnings of the corporation owning or operating such railroad, arising from the operating of such railroad, as shall be situated within this Territory, both upon territorial and interstate traffic, in case the railroad company owning or operating such line shall accept and become subject to this act as hereinafter provided.

Every such railroad corporation or person owning or operating or that may hereafter own or operate any line of railroad in this Territory which shall have accepted this act shall pay to said treasurer each year " for the first five years " after the approval of this act an amount equal to three per centum of such gross earnings, " and for and in each and every year after the expiration of such five years an amount equal to two per cent of said gross earnings," and the payment of such amount annually as aforesaid shall be and is in full of any and all other taxation and assessment whatever upon the property aforesaid.

Said payments shall be made, except as hereinafter provided, one-half on or before the 15th day of February, and one-half on or before the first day of August in each year. And for the purpose of ascertaining the gross earnings aforesaid, an accurate account of such earnings shall be kept by said company. An abstract shall be furnished by said company to the treasurer of this Territory on or before the first day of February in each year, the truth of which abstract shall be verified by the affidavits of the treasurer and secretary of such company, and for the purpose of ascertaining the truth of such affidavits and the correctness of such abstracts, full power is hereby vested in the governor of this Territory, or any other person appointed by law, to examine under oath the officers, employés of said company, or other persons, and if any person so examined by the governor or other authorized person shall knowingly or wilfully swear falsely, concerning the matter aforesaid, every such person is declared to have committed perjury; and for the purpose of securing to the Territory the payment of the aforesaid per centum it is hereby declared that the Territory shall have a lien upon the railroad of said company, and upon all property, estate, or effects of said company whatsoever, personal, real, or mixed, and the lien hereby secured to the Territory shall have and take precedence of all demands, decrees, and judgments against said company.

2. *When company shall fail to make return.* — If any such railroad company having accepted this act shall fail to make return of its gross earnings as aforesaid, or of any part thereof, at the time and in the manner provided by law, and such default shall continue during the period of thirty days, such company shall be subject to a penalty of an amount equal to ten per

is provided in the act of 1883, it differed from that act in not being compulsory upon the railroad companies, for it left to

cent of the tax imposed upon such company by this act, and the treasurer of the Territory shall forthwith ascertain the amount of such percentage justly due from such company, as near as may be, from such evidence as may be available, and shall thereupon collect such amount so ascertained, together with the said penalty thereon.

The amount so ascertained by the territorial treasurer as in this section provided shall, together with the said penalty thereon, be by him entered in the books of his office, and such entry when so made shall stand in the place of the report required by law to be made by such company, and shall in all courts within this Territory be evidence of the amount of such tax and penalty and of the other facts stated therein in pursuance of this act.

3. *Neglect to pay taxes.* — In case any railroad company which shall have accepted the provisions of this act shall fail or neglect to pay the amount reported at the time and in the manner hereinafter provided, for a period of thirty days after the same shall have become due by the terms thereof, in such case there shall be added to the amount of such tax ten per centum thereof as a penalty for such failure or neglect to pay.

4. *Territorial treasurer to distrain.* — At any time after the expiration of the period of thirty days after the amount as above provided has become due and payable under the provisions of this act, the territorial treasurer or his deputy shall distrain sufficient goods, chattels, or other movable property, if found within this Territory, to pay the said amount due from such corporation, together with the penalty thereon as hereinafter provided, and shall immediately advertise the sale of the same in at least three newspapers published within this Territory, stating the time when and the place where such property shall be sold; such sale shall take place at some point on the railroad of such delinquent company, and at least four weeks' notice of the time and place of such sale shall be given; such delinquent company, its successors or assigns, may pay in such amount and penalty at any time before the sale of the property distrained as herein provided, and thereupon further proceedings in connection with such distress shall cease; and the property distrained shall be delivered to the owner thereof.

5. *Land subject to taxation.* — The lands of any railroad company shall become subject to taxation in the same manner as other similar property as soon as the same are sold, leased, contracted to be sold or leased; and on or before the first day of April of each year each railroad company having lands within this Territory shall return to the county clerk of each county within this Territory full and complete lists, verified by the affidavit of such officers of the company having knowledge of the facts, of all lands of such company situated within such county, sold, or contracted to be sold, or leased, during the year ending the last day of December preceding, and the list furnished on or before the first day of April, A.D. 1889, in compliance with the terms of this section, shall include a complete list of all lands sold or leased, prior to the last day of December, 1888.

them the election as to which of two modes of taxation they
should accept or submit to. It practically gave to the rail-

---

6. *How taxes apportioned.* — The moneys received and collected by the
territorial treasurer in pursuance to this act shall be disposed of by him as
follows : In case the railroad company paying such tax owns no land
granted in aid of the construction of its railroad, one-third of the same
shall be retained in the territorial treasury for the use of the Territory, and
the remainder shall be apportioned among the several counties into or
through which the railroad or railroads of such companies run, in propor-
tion to the number of miles of main track situated in such counties respec-
tively. In case the railroad company paying such tax owns land granted
in aid of the construction of its railroad, then thirty per cent of the tax
paid by such company shall be retained in the territorial treasury for the
use of the Territory, and forty per cent shall be apportioned among the
several counties into or through which the railroad or railroads of such
company run, in proportion to the number of miles of main track situated
in such counties, respectively, and thirty per cent shall be apportioned
among the several counties in which lands forming a part of its land grant
are situated, in proportion to the number of acres of surveyed and unsold
lands in said counties.

7. *Any railroad company.* — Which, at the date of the passage of this
act owns or is engaged in operating any line or lines of railroad in this
Territory, may at any time within thirty days after the passage of this act,
by resolution of its board of directors, attested by its secretary, and filed
with the secretary of the Territory, accept and become subject to the
provisions of this act, and provided that any railroad company which is
now in arrears in the payment of taxes assessed under chapter 99 of the
Laws of 1883 shall, within thirty days after the passage of this act, pay
into the territorial treasury the full amount of the taxes and interest due
under the assessments under said laws of 1883 before they can avail them-
selves of the provisions of this act, by accepting its terms, including taxes
on both territorial and interstate earnings. It is further expressly provided
that any company failing to strictly comply with the provisions of this act
within the term herein provided shall be immediately subject to assessment
and taxation in the manner provided for the assessment and taxation of
the property of individuals of this Territory, and said taxes shall be
collected in the same manner as is now provided in cases of the property
of individuals. Any company which has not complied with the provisions
of chapter 99 of the Session Laws of 1883, by paying all taxes claimed on
gross earnings both territorial and interstate, or by filing an account of
gross earnings both territorial and interstate, shall prepare and file such
account in the manner therein provided within thirty days from the passage
hereof, and pay one-half of the entire amount due under the agreement
and acceptance herein referred to, for the current year, and also the entire
amount of taxes heretofore claimed by the Territory on local and interstate

road companies the choice of having their property taxed as other property in the Territory, by assessment and levy, or of taking the benefits of the act upon the terms and conditions provided therein.   It was, by section 7, made a condition of

earnings of such companies, but remaining unpaid at the time of filing said account and within thirty days after the passage of this act, or the same shall not apply to such company or companies.   The balance of said taxes due for the current year shall be paid to the territorial treasurer on or before the 15th day of August, 1889.   Any railroad company that may be hereafter organized in this Territory, or that shall hereafter become the owner of or engaged in operating any lines of railroad in this Territory, may accept and become subject to the provisions of this act by filing a resolution of its board of directors in the manner as hereinbefore provided.

In case any such railroad company shall accept and become subject to the provisions of this act, it shall at the time of filing such acceptance render an account of gross earnings both territorial and interstate, in the manner as hereinbefore provided, and shall pay at the time of rendering such account, all amounts claimed by the territorial auditor as taxes due on the local and interstate earnings of such company for the current or any preceding year, and shall thereafter pay an amount equal to 3 per centum of such account, as follows : If such acceptance is filed on or before the fifteenth day of February in any year, such company shall pay one-half of said amount on said fifteenth day of February, and the balance on the fifteenth day of August following.   Should such acceptance be filed before the fifteenth day of August and after the fifteenth day of February in any year, then an amount equal to 3 per centum of such account shall be paid in full on or before the fifteenth day of August in each year.   Thereafter accounts shall be rendered and payment made in the manner provided in this act; *provided*, that any company failing to promptly and strictly comply with the provisions herein set forth and to pay all sums herein provided to be paid shall be subject to assessment and taxation in the same manner as individuals.

8. *In case of non-acceptance.* — The railroads and property of all railroad companies owning or operating lines of railway in this Territory, which companies shall not accept and become subject to the provisions of this act, shall not be entitled to the exemption in this act contained, but shall be subject to taxation in such manner as shall be provided by law.

9. *Repeal or amendment.* — This act shall be subject to repeal or amendment by any future legislature, and nothing herein contained shall be construed as a repeal of any revenue law now in existence, as applicable to any railroad company which shall not accept the provisions of this act as herein provided.

10. *Effect when.* — This action shall take effect and be in force from and after its passage.

Approved March 7, 1889.

the acceptance of the act that " any railroad company assessed under chapter 99 of the Laws of 1883 shall, within thirty days after the passage of this act, pay into the territorial treasury the full amount of the taxes and interest due under the assessments under said laws of 1883, including taxes on both territorial and interstate earnings," "before they can avail themselves of the provisions of this act." It was further provided that any company failing to strictly comply with the provisions of the act within the time provided should be immediately subject to assessment and taxation upon its property in the same manner as the property of individuals was assessed and taxed.

The companies accepting the benefits of the act were not only to pay arrearages under the law of 1883, but were also to pay a percentage of gross earnings for the current year of 1889, it being provided that " if such acceptance was filed on or before the 15th day of February in any year such companies should pay one-half of said amount on said 15th day of February and the balance on the 15th day of August next following. Should acceptance be filed before the 15th day of August and after the 15th day of February in any year, then an amount equal to three per centum of such account shall be paid in full on or before the 15th day of August in each year."

It is shown by the bill that the appellant accepted the provisions and benefits of the act within thirty days after March 7, 1889, and it thereby became liable to pay the required percentage on its gross earnings on or before the 15th day of August, 1889. It is also shown by the bill that within thirty days after the passage of the act it paid the arrearages of percentages on its gross earnings accruing under the act of 1883, for the years 1886, 1887, and 1888; but it is not alleged that it made payment, or tender of payment, of the percentage on its gross earnings for the year 1889, or any portion thereof, although by the express provisions of the act a percentage on a portion of such gross earnings was due and payable on the 15th day of August, 1889.

The moneys to be received and collected by the territorial

treasurer under this act from the railroad companies which accepted its provisions were to be apportioned between the Territory and the several counties, respectively, through which the railroads run, or in which the companies had lands subject to taxation, in the manner pointed out in section 6 of the act. The several counties, whose auditors are made defendants in the present case, were therefore interested in the gross earnings tax, which the appellant was required to pay for the year 1889 in lieu of all other ordinary taxes upon its property.

The gross earnings act remained in force until November 2, 1889, when it was repealed by the repugnant provisions contained in the constitution of the State of North Dakota, as adopted and approved by Congress, and the claim is now made by the appellant that this repeal relieves it from liability to pay any percentage on its gross earnings for the year 1889, or any part thereof, because the same was not payable until after 1890; and that it was not liable to assessment and taxation on its property because it had accepted the provisions of the gross earnings act of 1889.

This contention, if correct, would relieve the appellant from any burden in the way of taxation for the year 1889, but such a claim as this cannot possibly be sustained. The act of March 7, 1889, clearly intended that the gross earnings tax, therein provided for, as to all companies which would accept its provisions, should supply revenue for the Territory and the counties for the year 1889. It is equally clear from the whole act, as a tax law, that the railroad company had to pay the required percentage on its gross earnings for that year, and that such percentage was payable in part on the 15th day of August in that year. It is not therefore correct to say that no part of the gross earnings were payable until 1890; but, if that were not the case, having accepted the provisions of that act and thus becoming liable to pay the designated percentage of its gross earnings in lieu of taxes for the year 1889, that liability would not be discharged by the subsequent repeal of the gross earnings act of 1889. If the company was released from the gross earnings tax by the repeal of the act its property immediately became subject to assessment

and taxation in the manner provided for the assessment and taxation of property of individuals in the Territory, and it would not vitiate any such assessment made on the part of the counties that happened to be made prior to the repeal of the act of 1889. Such assessment would remain in full force and effect after the repeal of the act, and until satisfied.

It is next contended by the appellant that its payment of arrearages, claimed to be due under the act of 1883, was a consideration for the exemption of its property from taxation for the year 1889. This position cannot be sustained, for, by the terms of the act of 1889, the payment of those arrearages was simply a condition upon which the railroad company was allowed to accept the benefits of that act, which was not an act exempting the property of the railroad company from taxation, but merely substituted one mode of taxation for another upon the terms and conditions specified. One of the terms on which the railroad was allowed to accept the gross earnings tax, in lieu of the ordinary tax upon its property, was that it should pay the arrearages which the Territory claimed under the act of 1883. No exemption from taxation for the year 1889 was contemplated. The railroads accepting the act were required to pay the gross earnings tax for that year in addition to such arrearages. It cannot, therefore, be properly claimed that the payment of these arrearages constituted a consideration for any exemption from taxation, or that such payment raised any equity on the part of the appellant against the payment of taxes for 1889, whether such taxes were imposed in the shape of a percentage on the gross earnings for that year, or in the shape of the ordinary assessment upon its property.

There is nothing in the allegations of the bill showing affirmatively that the company did not possess the equitable title or ownership in the lands described and assessed. Nor do the averments of the bill negative the fact that the appellant was properly chargeable with taxes on the lands coming within the grant of July 2, 1864, and within the limits of the line of definite location of its road. Payment of the gross earnings tax, imposed by the act of 1889, would have dis-

charged all claims for taxes upon the company's lands for that year, but no ground is shown by the bill for releasing the appellant from the payment of either the percentage tax on its gross earnings, or from the payment of the assessments upon its lands made by the county auditors. By section 7 of the act of 1889, its failure to promptly and strictly comply with the provisions thereof, and pay all sums therein provided to be paid, subjected the company to assessment and taxation in the same manner as individuals. It did not comply with the provisions of the act in paying the percentage of gross earnings due on the 15th day of August, 1889, and thereupon its property became liable to assessment and taxation as the property of individuals in the several counties.

Being liable to pay either the percentage on gross earnings in accordance with the provisions of the act of 1889, or the tax upon its lands, as other property of like character was assessed, the appellant was not entitled to any relief in a court of equity by injunction without payment or tender of what was due under one or the other of these modes of taxation.

In *State Railroad Tax Cases*, 92 U. S. 575, 616, 617, the rule is established that before an injunction will be granted in such cases as the present, a party must pay or tender what can be seen to be due on the face of the bill, and, speaking for the court in that case, Mr. Justice Miller said that the duty of making such a tender or payment before any injunction will be allowed is laid down "as a rule to govern the courts of the United States in their action in such cases." This rule was repeated in *National Bank* v. *Kimball*, 103 U. S. 732, 733, where it was treated as a fatal objection to the bill that there was no offer to pay any sum as a tax which the party ought to pay, and, again speaking for this court, Mr. Justice Miller there said: "We have announced more than once that it is the established rule of this court that no one can be permitted to go into a court of equity to enjoin the collection of a tax, until he has shown himself entitled to the aid of the court by paying so much of the tax assessed against him as it can be plainly seen he ought to pay," etc.

Applying this rule to the present case, it is clear that the

appellant's bill was properly dismissed for failing to pay, or tender to pay, taxes which he ought to have paid on its property, or, in lieu thereof, a percentage of its gross earnings.

Our response, therefore, to the eighth question certified is, that the bill was without equity, because of the failure to aver that the plaintiff had tendered or paid the gross earnings percentage for the year 1889, (or the tax assessed by the county auditors,) and was not entitled to the equitable relief prayed without first tendering or paying such taxes.

*The answer of the court to that question will accordingly be certified to the Circuit Court of Appeals for the Eighth Circuit.*

MR. JUSTICE BREWER dissented.