# McHENRY v. ALFORD.

## CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 189. Argued December 2, 3, 1897. — Decided January 3, 1898.

The ruling in *United States* v. *Union Pacific Railroad*, 168 U. S. 505, that each question certified to this court from a Circuit Court of Appeals "had to be a distinct point or proposition of law, clearly stated, so that it could be distinctly answered without regard to the other issues of law in the case; to be a question of law only and not a question of fact, or of mixed law and fact, and hence could not involve or imply a conclusion or judgment upon the weight or effect of testimony or facts adduced in the case, and could not embrace the whole case, even where its decision turned upon matter of law only, and even though it was split up in the form of questions," is affirmed and followed; and, being applied to the questions certified in this case, makes it necessary for the court to decline to answer the first, the second and the sixth questions.

Chapter 99 of the Laws of the Territory of Dakota of 1883 provided for the taxation of the lands of the Northern Pacific Railroad Company granted to it by Congress, outside of its right of way and not used in its business, while owned by the company and not leased, through the payment of percentages on gross earnings as provided for therein; the plain meaning of that act being to render the railroad company and all its property, land grants as well as right of way, free from the payment of all taxes, excepting to the amount and in the manner described in the act.

That legislation was not in conflict with the provision in the act of March 2, 1861, c. 86, 12 Stat. 239, providing that no law "shall be passed impairing the rights of private property; nor shall any discrimination be made in taxing different kinds of property; but all property subject to taxation shall be in proportion to the value of the property taxed."

It is not necessary to decide whether the act of 1883 conflicts with the Constitution in that it lays taxes upon earnings arising from transportation of persons and property between different States.

The objection that the act of 1883 violates the Fourteenth Amendment is untenable.

The railroad company can avail itself of the payment of the taxes under the act of 1883 as a full payment of the taxes for the year 1888, and the court answers the fourth question in the negative.

The next and fifth question is answered in the affirmative. The payments made by the railroad company for the year 1888, as set forth in the bill, embraced the whole amount of taxes due from the defendant for that year (as well as others) under the act of 1883. Even if not paid at the exact time provided for in the statute, the failure to so pay might be waived by the public authorities, and as the moneys were in fact paid to and received by the officers of the Territory and went into its treasury, and never have been returned or tendered back, there was an effectual waiver of any objection which might possibly have been urged that the payment was not in time.

THIS case comes here on a certificate from the United States Circuit Court of Appeals for the Eighth Circuit, and that court certifies several questions concerning which it desires the instruction of this court for the proper decision of the cause. These questions are founded, among other papers, upon the bill of complaint which forms part of the record herein. It appears that the bill was filed by the complainants' predecessors (who were receivers of the property of the Northern Pacific Railroad Company) on the 22d day of March, 1894, in the district court of the fourth judicial district of North Dakota, sitting for the county of Richland in that State. It was filed, among other things, for the purpose of obtaining a decree adjudging that certain alleged and pretended and attempted assessments, under state authority, were null and void, and that all certificates and deeds executed by virtue of such assessments were void and constituted clouds upon the title to the lands described therein, and which were alleged to be owned by the corporation of which the plaintiffs were receivers. Some of the individual defendants named in the bill were alleged to have purchased, at a tax sale under the assessments, separate portions of the property of the company situated in Richland County, and to have received certificates or deeds from the county officials purporting to convey to each of them certain portions of such property. Upon a petition of one of the individual defendants named Sumner R. Clark, alleging diverse citizenship between the parties and the existence of a separate con-

troversy between the petitioner and the complainants, a removal of the cause to the United States Circuit Court for the District of North Dakota was prayed for, and on the 5th of September, 1894, the court granted the petition and made an order for the removal of the cause. Upon a trial of the issues joined in the case, the Circuit Court of the United States for the District of North Dakota dismissed the complainants' bill, and the complainants thereupon appealed to the United States Circuit Court of Appeals for the Eighth Circuit.

It appears from the complainants' bill, that the Northern Pacific Railroad Company was a corporation created and existing by virtue of an act of Congress, approved July 2, 1864, c. 217, 13 Stat. 365, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound, on the Pacific coast, by the northern route." The third section of that act, for the purpose of aiding in the construction of a railroad and telegraph line to the Pacific coast, granted to the railroad company, its successors and assigns, certain portions of the public lands, as mentioned in the section. Pursuant to the provisions of the act, and prior to the year 1888, the company had definitely fixed the line of its railroad, and prior to that year had constructed and put in operation a continuous line of railroad and telegraph, extending from the waters of Lake Superior westerly and through the Territory of North Dakota to the waters of Puget Sound; and prior to, and during the year 1888, many thousand acres of land in North Dakota were owned by the railroad company, under the land grant above mentioned, although patents for a portion of the same were not issued until June 24, 1893, and, for another portion, not until June 18, 1894. (No question is made by the complainants herein that the lands owned by the company were not taxable in 1888 on account of the fact that the company had not then received patents from the United States therefor.)

On the 31st of May, 1870, Congress adopted a resolution authorizing the company to issue bonds for the construction of its road, and to secure the same by mortgages on its prop-

erty of all kinds and description, real, personal and mixed, including its franchises as a corporation. Under that resolution the company executed, at different times, several mortgages to secure the payment of a hundred millions or more of bonds issued to aid in the construction of the road, and these mortgages covered all the property of the company, including the lands granted to it by the United States under the act of 1864.

In 1893 the company was insolvent and unable to meet the interest upon its bonds or to pay its other indebtedness, and in that year suits were duly commenced against it by creditors to recover the amount of its indebtedness, and also, by the trustee mortgagee, to foreclose the mortgages, in which suit receivers were appointed, and the complainants are their successors.

On March 9, 1883, the legislature of the Territory enacted a statute, entitled "An act to provide for the levy and collection of taxes upon railroad property of railroad companies in this Territory," Laws of 1883, c. 99, p. 211, the first and fifth sections of which are set forth in the margin.[1] This act was repealed by chapter 105 of the Laws of 1889.

---

[1] ACT OF 1883.

SECTION 1. *Percentage of Gross Earnings to be Paid in Lieu of Other Taxes.* — In lieu of any and all other taxes upon any railroads, except railroads operated by horse power, within this Territory, or upon the equipment, appurtenances or appendages thereof, or upon any other property situated in this Territory, belonging to the corporation owning or operating such railroads, or upon the capital stock or business transaction of such railroad company, there shall hereafter be paid into the treasury of this Territory a percentage of all the gross earnings of the corporation owning or operating such railroad, arising from the operation of such railroad as shall be situated within this Territory, as hereinafter stated, that is to say: Every such railroad corporation or person operating a railroad in this Territory shall pay to said treasurer each year for the first five years after said railroad shall be or shall have been operated in whole or in part, two (2) per centum of such gross earnings; and for and in each and every year after the expiration of the said five years, three (3) per centum of the said gross earnings; and the payment of such per centum annually as aforesaid shall be and is in full of all taxation and assessments whatever upon the property aforesaid. The said payments shall be made one half ($\frac{1}{2}$) on or before the fifteenth day of February, and one half ($\frac{1}{2}$) on or before the

Subsequently, and on the 7th day of March, 1889, the legislature of the Territory passed another act, entitled "An act for the levy and collection of taxes upon property of railroad companies in this Territory."

Section 7 of the act of 1889 is set forth in the margin.[1]

---

fifteenth day of August, in each year, and for the purpose of ascertaining the gross earnings aforesaid, an accurate account of such earnings shall be kept by said company; an abstract whereof shall be furnished by said company to the treasurer of this Territory on or before the first (1st) day of February in each year; the truth of which abstract shall be verified by the affidavits of the treasurer and secretary of said company, and for the purpose of ascertaining the truth of such affidavits and the correctness of such abstracts, full power is hereby vested in the governor of this Territory, or any other person appointed by law, to examine under oath the officers and employés of said company, or other persons, and if any person so examined by the governor or other authorized persons shall knowingly or wilfully swear falsely concerning the matter aforesaid, every such person is declared to have committed perjury. And for the purpose of securing to the Territory the payment of the aforesaid per centums, it is hereby declared that the Territory shall have a lien upon the railroad of said company and upon all property, estate and effects of said company whatsoever, personal, real or mixed. And the lien hereby secured to the Territory shall have and take precedence of all demands, decrees and judgments against said company.

SEC. 5. *Lands Subject to Taxation.*— The lands of any railroad company shall become subject to taxation in the same manner as other similar property, as soon as the same are sold, leased or contracted to be sold or leased; and on or before the first day of April of each year, each railroad company having lands within this Territory, shall return to the county clerk of each county, full and complete lists, verified by the affidavits of some officer of the company having knowledge of the facts, of all lands of such company situated in such county, sold or contracted to be sold or leased during the year ending the last day of December preceding, and the list furnished on or before the first day of April, A.D. 1883, in compliance with the terms of this section, shall include a complete list of all lands sold or leased, or contracted to be sold or leased, prior to the last day of December, A.D. 1882.

[1] ACT OF 1889.

SEC. 7. *Any Railroad Company* which at the date of the passage of this act owns or is engaged in operating any line or lines of railroad in this Territory, may at any time within thirty days after the passage of this act, by resolution of its board of directors, attested by its secretary, and filed with the secretary of the Territory, accept and become subject to the provisions of this act, and provided that any railroad company which is now

The Northern Pacific Railroad Company, within thirty days after the passage of the act of 1889, duly accepted its provisions, and within thirty days from that date paid into the treasury of the Territory the entire amount of taxes and interest theretofore claimed by the Territory as due and remaining unpaid to it from the company on local and interstate earnings under the act of 1883, excepting that the second half of the sum due from the company to the Territory for the taxes of 1888, according to the provisions of the act of 1883, was not paid to and received by the treasurer of the Territory until August 15, 1889. The whole tax for 1888, under the act of 1883, amounted to nearly $100,000, while for all the years in which the company was in arrear under the act of 1883 (including the year 1888) the amount paid was nearly $200,000.

In the year 1888 the usual proceedings were taken by the officials of Richland County to assess all the property in the county under the general assessment laws of the Territory,

---

in arrears in the payment of taxes assessed under chapter 99 of the Laws of 1883, shall, within thirty days after the passage of this act, pay into the territorial treasury the full amount of the taxes and interest due under the assessments under said law of 1883 before they can avail themselves of the provisions of this act, by accepting its terms, including taxes on both territorial and interstate earnings. It is further expressly provided that any company failing to strictly comply with the provisions of this act within the term herein provided shall be immediately subject to assessment and in the manner provided for the assessment and the taxation of the property of individuals of this Territory, and said taxes shall be collected in the same manner as is now provided in cases of the property of individuals. Any company which has not complied with the provisions of chapter 99 of the Session Laws of 1883 by paying all taxes claimed on gross earnings, both territorial and interstate, or by filing an account of gross earnings, both territorial and interstate, shall prepare and file such account in the manner therein provided within thirty days from the passage hereof, and pay one half of the entire amount due under the agreement and acceptance herein referred to, for the current year, and also the entire amount of taxes heretofore claimed by the Territory on local and interstate earnings of such companies, but remaining unpaid at the time of filing said account, and within thirty days after the passage of this act, or the same shall not apply to such company or companies. The balance of said taxes due for the current year shall be paid to the territorial treasurer on or before the fifteenth day of August, 1889.

and in such assessment the land grant lands of the railroad company were included, (regardless of the act of 1883,) and thereafter in due course the taxes thus levied, not having been paid by the company, the treasurer of the county on the 4th day of November, 1889, attempted and pretended to sell many parcels of land belonging to the railroad company and being in the county already mentioned, for the purpose of collecting the taxes unpaid thereon, and no redemptions of the lands having been made, the county treasurer executed to the persons who purchased the lands or their assignees, some of whom are defendants in this suit, deeds purporting to convey the lands so sold to such persons, and these deeds are alleged to be invalid, but still a cloud upon the title of the company to the lands described therein.

The bill also sets forth a great many different alleged errors, irregularities and omissions on the part of the taxing authorities in taking proceedings to levy the taxes, by reason of which, as alleged, the taxation of the property of the company was illegal and the deeds were null and void.

A joint and several demurrer and answer to the bill was served upon the part of the defendants, taking issue upon some of the allegations of fact in the bill and demurring to other parts thereof, but a sufficient statement of the case has already been made to lead to a proper understanding of the questions hereinafter discussed.

*Mr. C. W. Bunn* for McHenry.

*Mr. Edgar W. Camp* for Alford.

Mr. JUSTICE PECKHAM, after stating the facts, delivered the opinion of the court.

The learned Circuit Court of Appeals has certified to this court six questions, concerning which it desires the instruction of this court for a proper decision of the cause. The following are the questions so certified:

"1. Has the United States Circuit Court for the District of North Dakota jurisdiction to hear and decide said case?

"2. Were or were not the lands described in the bill of complaint subject to taxation under the laws of the Territory of Dakota in the year 1888 by reason of the facts stated in the bill of complaint respecting the condition of the title thereof?

"3. Was it the purpose of chapter 99 of the Laws of Dakota for 1883 to exempt from taxation lands granted to aid in the construction of the Northern Pacific Railroad by the act of July 2, 1864, which are outside of its right of way and are not shown to be used in its business as a common carrier?

"4. If such was the purpose of the act was the act void in whole or in part as transgressing the limitations placed upon the power of the territorial legislature?

"5. Conceding that the purpose of chapter 99 of the Laws of 1883 was to exempt, among other things, the land grant of the Northern Pacific Railroad Company, and that said law is valid, are the payments of the percentage of the gross earnings for the year 1888, alleged in the bill to have been made, sufficient to entitle the complainant to the equitable relief sought?

"6. Conceding the lands in controversy to have been subject to taxation for the year 1888, were the appellants, by reason of any of the alleged irregularities or defects in the mode of assessment, entitled to equitable relief without first offering to pay the taxes properly chargeable against said lands?"

Of these questions, we think we ought to answer only the third, fourth and fifth. The first, second and sixth come within our rulings in the cases of *Jewell* v. *Knight,* 123 U. S. 426; *Fire Insurance Association* v. *Wickham,* 128 U. S. 426; *Maynard* v. *Hecht,* 151 U. S. 324; *Graver* v. *Faurot,* 162 U. S. 435; *Cross* v. *Evans,* 167 U. S. 60, and *United States* v. *Union Pacific Railroad, ante,* 505.

In the case last cited, in speaking of the rules which govern the certification provided for in sections 5 and 6 of the Judiciary Act of March 3, 1891, c. 517, 26 Stat. 826, the Chief Justice

repeated those rules as derived from prior decisions, and said that " each question had to be a distinct point or proposition of law, clearly stated, so that it could be distinctly answered without regard to the other issues of law in the case; to be a question of law only and not a question of fact, or of mixed law and fact, and hence could not involve or imply a conclusion or judgment upon the weight or effect of testimony or facts adduced in the case, and could not embrace the whole case, even where its decision turned upon matter of law only, and even though it was split up in the form of questions."

Guided by these rules, we find that the first question does not comply with their requirements. No single question of law is plainly raised therein. The record only shows that the case was commenced in a state court, and was removed upon the petition of one of the individual defendants into the Circuit Court of the United States for the District of North Dakota. Neither party (so far as appears from the record) raised any question of jurisdiction in the Circuit Court to hear and determine the whole case. Whether there is some defect supposed to exist in the petition for removal, or whether the controversy was or was not a separable one, or whether the citizenship of the different parties was not sufficiently alleged or did not sufficiently appear; whether the petition was filed in the proper time, or the bond was sufficient in form, or the approval of the court was or was not sufficient, all these questions are possible subjects of inquiry in order to answer the general question submitted to us. We should not be asked to grope our way through the papers submitted and examine every objection that imagination could raise, with no hint as to what, if any, objection is really supposed to exist. Some of the above enumerated possible objections could not in any event be answered in the present state of the record, which does not contain all the facts necessary to be known in their consideration. If the whole case were here upon writ of error or appeal, we should have to look into any question of jurisdiction, whether raised or not, but we are not obliged to do so when questions only are certified to us, unless presented in proper form.

The second question we regard as equally objectionable. The question certified is not a distinct point or proposition of law clearly stated so that it can be definitely answered without regard to other issues of law or fact in the case. What is the particular condition of the title to the lands which raises the doubt as to their being subject to taxation and induces the certification of the whole question to this court? This is not stated, and we are left to discover any or all possible objections by reading the bill and then conjecturing what the particular objection may really be.

What might otherwise have been considered as an objection, regard being had to the decision of this court in *North Pacific Railroad* v. *Traill County*, 115 U. S. 600, would seem to have been rendered of no force by the act of Congress of July 10, 1886, c. 764, 24 Stat. 143, providing for taxation of railroad grant lands. The question of law arising from the condition of the title is neither plainly stated nor is the condition itself clearly presented.

The sixth question, for the same reasons, cannot be answered. There is no plain statement of a distinct proposition of law. We are left to read the whole of that part of the bill alleging many different facts said to constitute various and separate irregularities, each of which might be a separate and distinct question of law, but all of which are joined together in an inseparable mass.

Questions of the character of the three thus described are not within the meaning of the act of 1891, and certifying them confers no jurisdiction upon this court to answer them.

We come then to the consideration of the third, fourth and fifth questions, and we will proceed to answer them.

The wording of the third question may at first sight render its meaning somewhat obscure. We are asked whether it was "the purpose of chapter 99 of the Laws of Dakota of 1883 to *exempt* from taxation lands granted to aid in the construction of the Northern Pacific Railroad by the act of July 2, 1864, which are outside of its right of way, and are not shown to be used in its business as a common carrier?" We

should answer — No, it was not the intention to exempt from but to change the mode of taxation.

This court, in *Northern Pacific Railroad* v. *Clark*, 153 U. S. 252, at page 271, in speaking of the act of 1889, which in this particular (that of substituting an assessment upon gross earnings) is similar in substance to the act of 1883, said that the act did not *exempt* the property of the railroad company from taxation, but that it merely substituted one method of taxation for another upon the terms and conditions specified.

But we take the true meaning of the question to be whether the act exempts from taxation the lands granted to aid in the construction of the railroad company in any other manner than as provided for in that act. Thus interpreting the meaning of the question, we are of opinion it should be answered in the affirmative.

The language of the act in its first section seems to be so plain as to be beyond the necessity of construction. The act says that the payments therein provided for are "in lieu of any and all other taxes upon any railroads, except railroads operated by horse power, within this Territory, or upon the equipment, appurtenances or appendages thereof, or upon any other property situated in this Territory belonging to the corporation owning or operating such railroads, or upon the capital stock or business transactions of such railroad company." These payments are also said to be "in full of any and all other taxation and assessments whatever upon the property aforesaid."

In addition to this plain language, the act, for the purpose of securing the payment of the taxes as provided, gives to the Territory a lien upon the railroad of the company and upon all its property, estate and effects whatsoever, personal, real or mixed. This provision for a lien upon all property of the company, together with the provision of section 5, that "the lands of any railroad company shall become subject to taxation in the same manner as other similar property as soon as the same are sold, leased or contracted to be sold or leased," is additional proof to conclusively show that the lands while

owned by the company and not leased, etc., shall not be taxed other than as they are taxed by the act and through the payment of the percentages on the gross earnings, as provided for therein. The principle that exemption from taxation must be clearly shown, and that it generally applies (if at all) only to property used in the business of the company claiming the exemption, is acknowledged and assented to. The case of *Ford* v. *Delta & Pine Land Co.*, 164 U. S. 662, is an illustration of the principle, but it does not here apply. The language of this act is clear and absolute. It is also not the case of an exemption from taxation but the substitution of one method for another. The land here in question is, in addition, closely connected with the business of the company. We shall show this more at length hereafter.

The learned counsel for the defendants argues that if the payment of the percentage of the earnings under this act was intended to be in lieu of the land tax, then a part at least of the payment would have been divided among the counties according to the value of the granted lands unsold within such counties, because, as he says, it is a well-known fact that many counties of North Dakota contain large tracts of land owned by this company but do not contain a mile of the line of its road, and under the provisions of this law a county thus situated received no part of the gross earnings tax. But this argument goes only to the alleged injustice of the appropriation of the tax when paid, and not to its extent or character.

Under the act of 1889 it is admitted that the legislature intended the exemption of lands like these in controversy from any taxation other than the indirect kind arising from the taxation of gross earnings, because under that act a part of the proceeds of the tax was divided among the counties according to the acreage of the unsold granted lands, even where no portion of the railroad was contained in such county. But the language of the exemption above described is substantially the same in both acts. The later act simply makes an appropriation of the proceeds of the tax somewhat different from that of the earlier one. The exemption was the same in each and founded upon the same language.

While the later act, perhaps recognizing the injustice in bestowing no portion of the tax collected upon those counties through which the road did not run, although lands of the company were therein situated, altered the disposition and appropriated a portion to the counties in which some of the lands were situated, yet no difference as to the intention of the legislature to exempt all the lands can be properly based upon this alteration. The exemption of the lands from a tax other than as therein provided for is based upon the same language in each act, and is perfectly plain in both.

It is also seen that by the act of 1879, c. 46, p. 122, Session Laws of Dakota, a system of taxation of certain specified property of railroad companies by a tax on their gross earnings was provided for, and the tax thus collected was stated in the act to be "in lieu of all other taxation . . . of the roadbed, right of way, stations or depot grounds, tracts, rolling stock, water stations," etc., "used in or incident to the operation of such railroad."

This act by reason of the tax on the gross earnings, limits the freedom from taxation, to the roadbed, as above stated, and property "used in or incident to the operation of such railroad." The act also provides that "all property of railroads not above enumerated, subject to taxation, shall be treated in all respect, in regard to assessment and equalization, the same as similar property belonging to individuals, whether said lands are derived from the general government or from other sources."

The difference between the language of the act of 1879 and that of 1883 is most marked. Instead of enumerating the particular property which is to be regarded as exempt from other taxation by reason of the tax on gross earnings, and providing for the taxation of the rest of the property of the railroad the same as similar property of the individual, as is the case in the act of 1879, the act of 1883 says the tax is in lieu of any and all other taxes upon any railroad within the Territory or upon the equipment or upon any other property situated in the Territory.

Does not this different language import, clearly and plainly, a different intention?

We are unable to think of any language of plainer meaning than that used in this statute, and there can be no doubt, as it seems to us, that its meaning is to render the railroad company and all its property, land grants as well as right of way, free from the payment of all taxes, excepting of the amount and in the manner described in the act.

This same question was argued in the Supreme Court of the State, and decided by it in 1892, in accordance with the views we have above expressed. *Northern Pacific Railroad* v. *Barnes*, 2 North Dakota, 310. It was afterwards decided in another way in *Railroad Co.* v. *McGinnis*, 4 North Dakota, 494, somewhat upon the theory that, as it was a Federal question, the court would follow the decision to that effect by a Federal court. 47 Fed. Rep. 681.

We are not embarrassed by these conflicting decisions, and we have no difficulty in answering the third question in the affirmative.

We come now to the fourth question which involves, among other things, the construction of one of the sections of the organic act creating the Territory of Dakota, (act of March 2, 1861, c. 86, 12 Stat. 239, at sec. 6, p. 241,) the material portion of which relating to the authority of the territorial legislature provides that no law "shall be passed impairing the rights of private property; nor shall any discrimination be made in taxing different kinds of property; but all property subject to taxation shall be in proportion to the value of the property taxed." The same provision in substance is found in section 1925, Revised Statutes, relating to the legislative assemblies of Colorado, Dakota and Wyoming.

It is argued by counsel that, although under this provision of the organic law, the territorial legislature could generally select the subjects of taxation, and could classify property for that purpose, and that these different classes of property could be valued or taxed by different methods, nevertheless the act of 1883, under consideration, is in excess of the lawful exercise of any of the powers granted under the organic act,

notwithstanding that act in the section above alluded to provided that " the legislative power of the Territory shall extend to all rightful subjects of legislation consistent with the Constitution of the United States and the provisions of this act." There must be some solid ground for making a distinct classification of property, and such ground does not exist, as is contended, by reason of any of the facts herein mentioned.

Viewing the character, condition and use of these lands, it is said to be plain that they are simply " property owned by a railroad," and not " railroad property," as described in the title to the act of 1883, and that the two are not equivalent terms; that although railroad property might be taxed in a special method and at a special rate, yet by the term " railroad property " is simply meant property necessary for use in the usual daily conduct of the business of the company as a common carrier by rail, and that any lands outside of that use, although owned by a railroad company, could not be classified and taxed in any different manner from land owned by an individual, otherwise such classification would be purely arbitrary, and the taxation in that way would be illegal; that no earnings arise from these lands which are assessed under the act, because the earnings upon which the tax is assessed are by the terms of the act restricted to " the gross earnings . . . arising from the operating of such railroad," and such earnings are not created by nor do they arise from nor are they in any way connected with these lands, which are therefore not taxed at all under this act, and no justification for their special classification for purposes of taxation can on that account be found.

All these various statements are made in the course of the main and general argument that these lands cannot be taxed under an act like that of 1883, because there is no sound distinction between such lands owned by the company and ordinary lands owned absolutely by an individual.

We do not concur in the accuracy of the description as to the condition of these lands, and we are not, therefore, impressed with the force of the argument based upon it. The

lands are not purely and simply owned or held for sale or
other disposition for profit, and in no way connected with the
use or operation of the railroad, and in regard to them the
company is not a landed proprietor, on the same footing with
any other proprietor of lands, and it is not correct to say that
these lands do not substantially, though indirectly, contribute
towards the gross earnings of the railroad company, as provided
in the act of 1883, nor can it be admitted that in merely taxing
the gross earnings arising from the operation of the road these
lands are not taxed at all. The lands are closely connected
with the railroad and with its operation, and they are not in
the same condition as a subject for taxation as are the lands
of an individual. While we agree that property of the same
kind and under the same condition and used for the same purpose
cannot be divided into different classes for purposes of taxation
and taxed by a different rule simply because it belongs to
different owners, yet, where the situation and the possible use
and the present condition of the ownership of lands are wholly
different, such as they are in this case from ordinary owner-
ship, a classification is not arbitrary nor unreasonable which
places such lands outside the class of lands owned in the ordi-
nary way by individuals.

Although the act here provides for the taxation of the gross
earnings arising from the operation of the road, the phrase
means earnings which arise because of its operation. The
road is in operation, and the earnings which it is thereby
enabled to make are to be taxed. Property which the com-
pany owns, and which has enabled and continues to enable it
to operate its road, is part of the property from which the
earnings arise by reason of such operation, and is within the
meaning of the act. These lands are of this description.
Although they are not taxed directly, yet the same is true of
the right of way, the roadbed, the engines, cars and water
tanks, all of which are confessedly "railroad property," with-
out which the road could not be operated. In substance, it
must be said that without the existence of all the various
pieces of property just enumerated, gross earnings would be
quite impossible. It is also true in regard to these lands. It

is not a question of what might under other circumstances have been their condition with relation to the railroad. We must take the circumstances that actually did exist at the time this act was passed for the purpose of determining this question. And, looking at those facts, we see that unquestionably these lands have indirectly contributed to the gross earnings derived from operating the road, and that such earnings have arisen and been made possible by reason of the lands. They have not only aided in making these gross earnings possible, but they have formed, and do still form, a material factor in the combination of circumstances contributing to the construction of the railroad, to its operation and to its earnings.

They originally formed a part of the public domain, and were granted by Congress for the purpose of aiding in the construction of this railroad to the Pacific coast, and were given to and accepted by the company, subject to the conditions named in the eighth section of the act. When the lands finally became the property of the company, they were impressed with a trust in favor of the Government, as representing the public, that they should be used for the purpose for which they were granted, and the company was not even allowed to mortgage or create any lien upon them in any way except by the consent of the Congress of the United States. Act of July 2, 1864, 13 Stat. 365, at page 370, section 10.

Subsequently it was found that the road could not be built under the conditions at first imposed, and Congress, therefore, in 1870, authorized the company to issue bonds for the construction of its road and to secure the same by mortgage. Under such authority, mortgages were thereafter made to secure bonds for more than a hundred million of dollars, the proceeds of which were used in building the road. These lands have, therefore, actually and directly contributed in a large measure and have formed a most potent factor towards building the road and enabling it to be operated and to earn moneys by reason of such operation. How can it be correctly said that they are not in any way taxed by a tax on the gross earnings of the road arising from its operation, when the road

could only be constructed and operated by reason (among others) of the moneys raised upon the security of these very lands? The present insolvency of the railroad company shows that the lands must form a most important item in the ability of the company or its successors to continue the operation of the road and make any earnings whatever.

If it be assumed that after the lands became the property of the company it was at that moment no more restricted in their sale than any other corporation organized to buy and sell real estate, and that it had the entire right to sell, or not to sell, or to mortgage to whom and at what price it might obtain, and that it owned the land like an individual, still the question is presented as to what was the actual condition of affairs when the act of 1883 was passed. At that time these lands were so closely connected with the railroad, its construction and operation, as in effect to be part and parcel thereof ; they stood as security for millions of bonds issued to secure the construction and operation of the road, and upon these facts the reason and justification for a classification, such as was made in that act, are plainly apparent. At that time totally different circumstances than those which surround an individual in the absolute ownership of his property existed in relation to these lands. As they made the gross earnings possible, it cannot be said, with the least regard to the fact, that those earnings did not in part issue out of the lands upon the same principle that they partly issued out of the right of way, the roadbed, track, engines, cars, tanks and other confessedly "railroad property." There is no difference in principle between the two classes of property so far as this question is concerned. Then, too, the road of the company runs through the whole State, hundreds of miles; it owns thousands upon thousands of acres therein, granted it for the purposes stated, and these lands it has accordingly pledged to redeem its bonds issued as mentioned. Its building was a work of national importance, and it was built for use by the Government, as well as for other purposes. Surely all these various facts justify a classification of such an entity for taxation by a different method and upon different lines than the

individual, and lands thus situated and owned are in a materially different condition from lands absolutely owned by an individual.

It is said this reasoning, while it might be applicable to the Northern Pacific Railroad Company, would not be applicable to many other railroads which had no land grants, or which were not situated as is the company in question, and that as the law is in its terms general and applies to all roads, this company cannot obtain its benefit without showing that it is a valid provision in regard to all railroad property. But if the property of this company is so situated and the facts regarding it are so materially different from other real estate as to fulfil the conditions upon which a general classification may be proper, we think the company could avail itself of the act even if some other companies could not.

Many cases are cited, in the brief of counsel, from the different States having provisions in their constitutions somewhat similar to those found in the organic act of Dakota, and in which States it has been held that the legislature is not confined to taxation in precisely the same method for all classes of property, but that it has power to classify and to provide different methods of taxation of the property so classified. The particular facts arose in and the cases are cited from Wisconsin, Iowa, Kansas, Louisiana, Michigan, New Jersey, Pennsylvania, Mississippi, Missouri and Illinois. They are cited in the margin.[1]

---

[1] *Wisconsin Central Railroad* v. *Taylor County*, 52 Wisconsin, 37; *Griswold College* v. *Iowa*, 46 Iowa, 275; *Missouri River &c. Railroad* v. *Morris*, 7 Kansas, 210; *Francis* v. *Atchison, Topeka &c. Railroad*, 19 Kansas, 303; *Louisiana State Lottery Company* v. *New Orleans*, 24 La. Ann. 86; *New Orleans* v. *Kaufman*, 29 La. Ann. 283; *New Orleans* v. *Davidson*, 30 La. Ann. 554; *New Orleans* v. *Fourchy*, 30 La. Ann. 910; *People* v. *The Auditor*, 7 Michigan, 84; *Youngblood* v. *Sexton*, 32 Michigan, 406; *State ex rel. Vail's Executors* v. *Runyon*, 41 N. J. Law, 98; *Kittanning Coal Company* v. *Commonwealth*, 79 Penn. St. 100; *Mississippi Mills* v. *Cook*, 56 Mississippi, 40; *Crow* v. *State*, 14 Missouri, 237; *Hamilton* v. *St. Louis County Court*, 15 Missouri, 3; *State* v. *North*, 27 Missouri, 464, 483; *Illinois Central Railroad* v. *McLean County*, 17 Illinois, 291; *State* v. *Crittenden County*, 19 Arkansas, 360; *St. Louis, Iron Mountain & Southern Railroad* v. *Berry*, 41 Arkansas, 509; *Arkansas Midland Railroad* v. *Berry*, 44 Arkansas, 17.

Upon a full consideration of the subject, we are persuaded that there is nothing in any provision of the act of 1883 for the taxation of the gross earnings which violates the letter or the spirit of the organic act.

Objection is also made to the act of 1883 on the ground that it is in violation of the commerce clause of the Federal Constitution in that by its terms taxes are laid upon earnings arising from the transportation of persons and property between different States, etc. In other words, that the tax is not confined to earnings which arise from the transaction of its business wholly within the State. It is said that the case of *State Tax on Railway Gross Receipts*, 15 Wall. 284, holding that the imposition of taxes upon gross receipts of railway companies was not illegal, although the gross receipts were made up in part of freights received from the transportation of merchandise from one State to another or through one State into another, has been overruled by the subsequent cases in this court, among which are those of *Fargo* v. *Michigan*, 121 U. S. 230, 244; *Philadelphia & Southern Steamship Company* v. *Pennsylvania*, 122 U. S. 326; and it is claimed that the case is not brought under that of *Maine* v. *Grand Trunk Railway Company*, 142 U. S. 217, in that there is no provision for ascertaining the amount of gross earnings derived from interstate commerce and for the taxation of the balance only.

A perusal of the first section of the act does not render it at all clear that there was intended to be a tax of any portion of the gross earnings of the corporation which arose from interstate commerce. The language of the act which declares that the tax should be paid into the treasury of the Territory upon a percentage of all gross earnings of the corporation owning or operating such railroad "arising from the operation of such railroad as shall be situated within the Territory," gives great reason to doubt the correctness of the construction which would levy the tax upon the earnings derived from interstate commerce. But there is great force in the claim that the act is not subject to the objections mentioned in the above cases reported in 121 and 122 United States, and the cases

therein referred to. In those cases there was a distinct tax upon the gross earnings without reference to any other tax, and not in substitution or in lieu of another tax, while in this case the act plainly substitutes a different method of taxation upon the property of a railroad company. It is a tax upon the lands and all the other property of the company, but instead of placing a valuation upon the lands and other property, and apportioning a certain amount upon such valuation directly, as was the old method, a new one is established of taking a percentage upon the gross earnings as a fair substitute for the former taxes upon all the lands and property of the company, and when it is said, as it is in this act, that the tax collected by this method shall be in lieu of all other taxes whatever, it would seem that it might be claimed with great plausibility that a tax levied under such circumstances and by such methods was not in reality a tax upon the gross earnings, but was a tax upon the lands and other property of the company, and that the method adopted of arriving at the sum which the company should pay as taxes upon its property was by taking a percentage of its gross earnings.

We do not think it necessary, however, to decide this question, because we are of opinion that, by the act of 1889, the legislature proffered the company a compromise as to the taxes claimed to be due and the company accepted the same. Construing the act of 1883 as we do, and as meaning to exempt the company from the payment of all other taxes than those therein named, upon all its property of every name and nature, we find that in 1889 this company had been in default in the payment of its taxes under the act of 1883 for the years 1886, 1887 and 1888. It owed nearly two hundred thousand dollars in taxes for those years under that act. The taxing authorities of the county of Richland had also assumed to tax the lands of the company for the year 1888 in the same way as if owned by individuals, but the tax as thus assessed had not been paid by the company. In this state of affairs the act of 1889 was passed, the effect of which was to say to the company, if you will pay all the taxes that are due under the act of 1883, you may then accept and come in under

the provisions of this act. And there is in addition to this offer a clear and necessary implication from the language used in the act that if the company would pay those taxes in full which were thus in arrear such payment would operate as a discharge of all claims for taxes, including those claims made by virtue of the proceedings to tax the lands of the company under the general law. It certainly is not possible to believe that the legislature intended to make it a condition for the acceptance of the act of 1889 by the company that it should not only pay all the taxes which were provided for under the act of 1883, (and which by the terms of that act were in full of all other taxation,) and for the payment of which the company might be in default, and yet and in addition should still be liable to pay the taxes as assessed in Richland County under the general law. We cannot suppose the legislature intended to compel the payment of taxes twice, and therefore the language of the act of 1889 providing for the payment of all taxes in arrear under the act of 1883 as a condition for the acceptance of the act of 1889, implied that such payment should also be in full of all other claims for taxes assessed for the same years. Such a condition and proposition were entirely within the power of the legislature to impose and make, and when the proposition was accepted and the condition performed by the payment of money into the treasury of the Territory, all claim for taxes under any general law levied directly upon the lands necessarily fell with such payment and acceptance. This implied release of the taxes for the year 1888, which the authorities had assumed to levy under the general law and not under the provisions of the act of 1883, arises from the language of the act of 1889, and is just as strong and just as clear as if it had been stated in so many words in that act. That which arises by plain and clear implication from the language used in an act is as much a part of the act as if the implication had been embodied in so many words.

It may be said that the money should have been paid, if at all, within thirty days after the passage of the act. Possibly, if the payment had not been made within that time and the

company subsequently had offered to pay it, the money might have been refused by the authorities of the Territory, as not paid in time. But the question of the time of payment was one which might be waived by the public authorities, and the objection was in law and in fact waived by the receipt and retention of the money.

The other objection made to the act of 1883, that it violates the Fourteenth Amendment, we think untenable under the views we have above expressed.

Basing our opinion upon the facts of this case, we would say that for the reasons herein stated the company can avail itself of the payment of the taxes under the act of 1883 as a full payment of the taxes for the year 1888, and we formally answer the fourth question in the negative.

The next and fifth question we answer in the affirmative. The payments made by the railroad company for the year 1888, as set forth in the bill, embraced the whole amount of taxes due from the defendant for that year (as well as others) under the act of 1883. Even if not paid at the exact time provided for in the statute, the failure to so pay might, as we have already stated, be waived by the public authorities, and when the moneys were in fact paid to and received by the officers of the Territory and went into its treasury, and never have been returned or tendered back, we think there was an effectual waiver of any objection which might possibly have been urged that the payment was not in time.

To sum up, therefore, we do not answer the first, second and sixth questions. The answers to the third, fourth and fifth we make as above stated, and they will be

*So certified.*