# Richmond.

## COMMONWEALTH OF VIRGINIA v. CASTNER, CURRAN & BULLITT, INC.

### January 17, 1924.

1. TAXATION—*Licenses—Interstate Commerce—Foreign Corporations—Coal Agency—Case at Bar.*—In the instant case, an application to correct an erroneous assessment of license taxes, the applicant was a foreign corporation, whose principal office was in the State of New York but who maintained a branch office in Virginia. The applicant did not mine any coal or lease or operate any coal mines, nor have any coal storage yards in the State, nor retail any coal in the State, nor was coal sold by it located in the State at the time of the sale, nor did it represent any coal operator whose mine was located in the State. Its agency in the State was wholly a sales agency of coal located in another State at the time of its sale.

   *Held:* That the business conducted by the applicant in this State was exclusively interstate commerce, and that a license tax based upon the gross commissions of the applicant would be a tax upon interstate commerce and is prohibited by the Constitution of the United States.

2. TAXATION—*Licenses—Interstate Commerce Sales—Agents—Undisclosed Principal.*—The owner of property located in a foreign State has the right to sell that property either in person or through an agent without rendering either himself or the agent liable to taxation by the State in which such sale is made. The tax upon the agent would be in reality a tax upon the nonresident owner of the property, and the principle is the same whether the agent is acting for a disclosed or an undisclosed principal, or an undisclosed principal upon a *del credere* commission.

3. APPEAL AND ERROR—*Judicial Notice—Legislative Charter of Corporation.*—In the instant case, an application to correct an erroneous assessment of license taxes, it was claimed that applicant's business was general, in the sense that it represented resident as well as non-resident principals, and in their reply brief counsel for the Commonwealth referred to an act of Assembly containing the charter of one of the companies represented by the applicant. Up to that time the case had proceeded upon the allegation of the petition of the applicant, nowhere denied by the Commonwealth, that all of the principals of the applicant were nonresidents of the State.

*Held:* That even if the point could be raised for the first time in a reply brief, it would be unavailing, as the Supreme Court of Appeals will not take judicial notice of the existence or contents of legislative charters of private corporations which were not relied on in the court below.

4. TAXATION — *Licenses — Interstate Commerce — Agents — "General Business."*—The business in which an agent engages is not made a "general business" by the fact that the agent represents more than one principal. If the principals are all nonresidents, and the agent is engaged exclusively in selling goods belonging to them in another State for the purpose of introducing them into the State in which the sale is made, the latter State has no power to require the agent to pay a license tax to conduct such sales.

5. LICENSES—*Income Taxes—Interstate Commerce—Sales Agency—Case at Bar.*—The tax sought to be imposed in the instant case, an application to correct an erroneous assessment of license taxes, was not an income tax, but a license tax for the privilege of doing business in the State based upon gross commissions received from all sources, and these sources were wholly subjects of interstate commerce. Whether or not the State could impose an income tax on the applicant was not involved in the controversy, and no opinion was expressed on the subject. Every license tax upon interstate commerce, whether it be large or small, is an interference with that commerce, and in its very nature is direct and substantial. A license tax upon the agent of a nonresident owner of goods in interstate commerce is a tax upon the goods and a burden upon and an interference with interstate commerce, and hence not within the power of the States.

6. SALES—*Interstate Commerce—Negotiation of Sales.*—The negotiation of sales of goods which are in another State, for the purpose of introducing them into the State in which the negotiation is made, is interstate commerce.

Error to a judgment of the Corporation Court of the city of Roanoke, in a proceeding to correct an erroneous assessment. Judgment for the applicant. The Commonwealth assigns error.

*Affirmed.*

The opinion states the case.

*J. Vaughan Gray* and *E. Warren Wall,* for the Commonwealth.

*Woods, Chitwood, Coxe & Rogers*, and *Thos. Raeburn White*, for the defendant in error.

BURKS, J., delivered the opinion of the court.

This was an application by Castner, Curran and Bullitt, Inc., to correct an erroneous assessment of license taxes for the years 1916, 1917 and 1918, under the statute cited in the margin.

There is little, if any, disagreement between the parties as to the facts of the case which are thus stated in the brief for Castner, Curran & Bullitt, Inc.:

"(1) That applicant is a foreign corporation, with its principal office in the State of New York, but maintaining branch offices in various States, one of such branch offices being located in Roanoke, in the State of Virginia.

"(2) That the business conducted by applicant at its Roanoke office is solely that of a coal sales agency for foreign coal mining corporations, whose mines are located wholly outside of the State of Virginia, to-wit: in West Virginia, and possibly one or two in Kentucky; that applicant does not itself own, conduct or lease any

---

"48. *Commission merchants and brokers.*—Every person, firm or corporation doing business in this State who receives or distributes provisions and merchandise, including flour, hay or grain, shipped to such person, firm or corporation for distribution on account of the shipper, or who participates in the profits ensuing from or accruing out of the sales of such provisions or merchandise, including flour, hay or grain, or who invoices such sales or collects the money therefor, shall be deemed to be a broker who receives or distributes provisions and merchandise, including flour, hay or grain.

"Every person, firm or corporation buying or selling for another any kind of merchandise on commission shall be a commission merchant * * *. Any person, firm or corporation buying or selling contrary to the provisions of this section, or who shall in any manner violate the same, shall pay a fine of not less than fifty dollars, nor more than one thousand dollars for each offense.

coal mines, and does not itself mine any coal; that none of the corporations whose output is sold by applicant are residents of Virginia, *nor is any of the coal sold by applicant located in the State of Virginia at the time of sale.*

"(3) That applicant does not own or operate any warehouses or coal storage yards in the State of Virginia, does not retail any coal and does not sell any coal at all in less than carload lots; that all of the coal sold by it makes a continuous journey from the point of shipment in West Virginia to the purchasers, most of whom are located in States other than Virginia.    Applicant has no property in this State, except office furniture, *and sells nothing but coal.*

"(4) That all coal sold by applicant is sold upon contracts made before the coal is introduced into the State of Virginia.    *In other words, the situs of the coal at the time of sale is outside of Virginia.*

"(5) That the 'contracts' of sale are first negotiated by the Roanoke office on account of the operators in West Virginia, and, after being signed by the purchasers, are sent to New York where they become accepted by the New York office; that the contract is not a completed one until accepted in New York; that the Roanoke office is given at various intervals a limited authority to sell small amounts of coal upon what are denominated as 'open orders,' and these open orders are not required to be approved by the New York office.    *But even the coal sold by the Roanoke office upon open orders is located outside of the State of Virginia at the time of sale.*

"49. *Commission merchants and brokers' license.*—Every person, firm or corporation shall pay for the privilege of transacting the business of a commission merchant or broker the sum of fifty dollars, provided the commissions do not exceed one thousand dollars, but when the commissions exceed one thousand dollars, the tax shall be fifty dollars, and an additional tax at the rate of one dollar for each hundred dollars or fraction thereof of commissions in excess of one thousand dollars.    *    *    *."    Tax bill (General Laws pp. 1950, 1951.)

"(6) That the proceeds of sale are forwarded by the customers to the Roanoke office and deposited in bank in Roanoke, but can be drawn upon only by the New York office for disbursement, the Roanoke office not using any of the proceeds of sale. The territory in which the Roanoke office sells is Virginia, South Carolina, North Carolina and Georgia.

"(7) That the function of the Roanoke office is exclusively a selling function. *It does not buy any coal, or any other commodity and sells only one commodity, to-wit: coal.*

"(8) That the relationship of applicant to the foreign coal mining corporation that it represents is that of a *del credere* agent; *that applicant does not represent any residents of Virginia,* and never has represented any except that perhaps about ten or twelve years ago, it represented a Virginia resident for a few months; that the contract of sale employed by applicant in selling coal to customers *inter alia* sets forth:

"(a) The names of the principals represented by applicant; (b) That applicant is acting as agent; (c) That the sales are made f. o. b. cars at mines; (d) That the sales are being made on behalf of the companies mentioned on the face of the contracts in the proportions of their current car percentages; and (e) That the product sold is 'Pocahontas Smokeless Coal.'

"(9) That Castner, Curran & Bullitt maintain at Bluefield, West Virginia, a shipping agent to whom the contracts or orders are forwarded, after being concluded, and that as the cars arrive at Bluefield from the various mines the shipping agent attaches to each car its destination. As the coal of all of applicant's principals is of the same grade and from the same region, it is immaterial to the purchaser from what mine the coal is derived. The method of handling the shipment is purely one of convenience and economy."

[1, 2] The applicant contends that the business conducted by it at Roanoke is exclusively interstate commerce, and that the tax sought to be imposed is a tax upon that commerce prohibited by the Constitution of the United States. The question to be decided, therefore, is whether the business conducted by the applicant constitutes interstate commerce. What constitutes interstate commerce, as an abstract proposition, is not free from difficulty, but its application to the varying facts of different cases has been prolific of much litigation and has given rise to numerous decisions by the Supreme Court of the United States which are binding on the State courts. Many of these cases have been cited by counsel, and they have argued the question with discrimination and ability, but in view of the admissions by counsel for the Commonwealth, both orally and on the brief, it will be unnecessary for us to examine them in detail. Counsel for the Commonwealth "recognize the right of the owner of property located in a foreign State to sell the property either in person or through an agent without rendering either himself or the agent liable to taxation" by the State in which such sale is made, and admit that "the tax upon the agent would be in reality a tax upon the nonresident owner of the property." They go further and say "The Commonwealth calls attention to the fact that it does not dispute the right of the owner (which in this case would be the operator of the mine) to sell his property in the State of Virginia without paying a license. It does not dispute the right of the owner to send agents into the State to solicit orders on its behalf." These admissions, it is conceded, are made in consequence of the decisions of the Supreme Court of the United States, cited and commented upon by counsel for the applicant in the following cases: *Robbins* v. *Shelby County*, 120

U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694; *Asher* v. *Texas*, 128 U. S. 129, 9 Sup. Ct. 1, 32 L. Ed. 368; *Stoutenburg* v. *Hennick*, 129 U. S. 149, 9 Sup. Ct. 256, 32 L. Ed. 637; *Leisy* v. *Hardin*, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128; *Lyng* v. *Michigan*, 135 U. S. 161, 10 Sup. Ct. 725, 34 L. Ed. 150; *McCall* v *California*, 136 U. S. 104, 10 Sup. Ct. 881, 34 L. Ed. 392; *Brennan* v. *Titusville*, 153 U. S. 289, 14 Sup. Ct. 829, 38 L. Ed. 719; *Stockard* v. *Morgan*, 185 U. S. 27, 22 Sup. Ct. 576, 46 L. Ed. 785; *Caldwell* v. *North Carolina*, 187 U. S. 622, 23 Sup. Ct. 229, 47 L. Ed. 336; *Dozier* v. *Alabama*, 218 U. S. 124, 30 Sup. Ct. 649, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264. The same view is taken in *Adkins and Co.* v. *City of Richmond*, 98 Va. 91, 34 S. E. 967, 47 L. R. A. 583, 81 Am. St. Rep. 705, in which a number of the foregoing cases, and others, are reviewed.

All of these cases are reviewed by counsel for the Commonwealth in their reply brief, and it is said that in each case in which the exemption was applied the agent of the nonresident principal was acting for, on behalf of, and in the name of such principal, and it is argued that applicant does not come within this category and hence is not entitled to the exemption; that "the business is absolutely independent of the business of the operators; at the time of the consummation of the sale the applicant is not acting for, in behalf of, or in the name of any particular principal, either resident or nonresident, but is acting on its own behalf and in its own name. The contract of sale does not specify any particular principal, and places no liability on any particular principal other than Castner, Curran & Bullitt to execute any of its terms. In fact, at the time the contract of sale is consummated the applicant does not know whose coal will be used to execute it." It is true that the cases cited were all cases in which the agent was

acting for a disclosed principal, and the court dealt only with the facts before it, but the principle involved was the same, and we know of no reason why a non-resident, as well as a resident, may not act through an undisclosed principal, or an undisclosed principal upon a *del credere* commission. The question involved was not the character of the agency, but were the parties engaged in interstate commerce. The question generally involved where the agent is acting on a *del credere* commission is whether the contract between the parties shows such an agency or a sale. *Balderston* v. *National Rubber Co.* 18 R. I. 338, 27 Atl. 507, 49 Am. St. Rep. 772. But that question is unimportant in this case, because it is admitted that if the applicant purchased the coal it is not liable to the tax.

[3] Counsel for the Commonwealth rely with confidence upon *Ficklen* v. *Shelby County*, 145 U. S. 1, 12 Sup. Ct. 810, 36 L. Ed. 601, to sustain their view that the applicant is liable to the tax, because it was engaged in a general business subject to a particular tax. In order to sustain the claim that its business was general, in the sense that it represented resident as well as non-resident principals, counsel for the Commonwealth, in their reply brief, refer to Acts 1883-4, chapter 473, page 655, containing the charter of the *Pulaski Iron Company*, which was one of the companies represented by the applicant. Up to that time, the case had proceeded upon the allegation of the petition of the applicant, nowhere denied by the Commonwealth, that all of the principals of the applicant were nonresidents of the State of Virginia, and the testimony showed that the address of the *Pulaski Iron Company* was Eckman, West Virginia. Even if the point could be raised for the first time in a reply brief, it would be unavailing, as courts will not take judicial notice of the existence or

contents of legislative charters of private corporations which were not relied on in the court below.    Code, section 6190.

The facts in the *Ficklen Case* did not present the question now under consideration, but expressly declined to pass on it.    This appears from the concluding language of the opinion.    "What position they (the brokers) would have occupied if they had not undertaken to do a general commission business, and had taken out no licenses therefor, but had simply transacted business for nonresident principals, is an entirely different question, which does not arise upon this record."    The question which did not there "arise upon the record" is precisely the question now under consideration.    In the *Ficklen Case* the facts were:    The agents were in a general commission business, not acting for any particular principals, within or without the State, but doing business with the general public.    The license required by the State statute was $50.00 per annum plus ten *per cent* on the capital invested, and if no capital was invested two and one-half *per cent* on the gross yearly commission, and bond was required to secure the latter.    They took out the general license, paid the $50.00 and executed the required bond.    It so happened that during the year all their business was for nonresident principals, though the fact might have been otherwise.    At the end of the year they refused to perform the stipulations of their bonds on the ground that their commissions had been received wholly from the sale of goods forwarded by nonresident principals, and that they were engaged in interstate commerce.    When they applied for license the next year it was refused on the ground that they had not complied with the stipulations of their bonds the year before.    "It was thought by a majority of the court that to release them from the

obligation of their bond, on account of the accidental results of the year's business, was refining too much, and that the plaintiffs who had sought the privilege of engaging in a general business should be bound by the contracts which they had made with the State therefor," and the State tax was upheld. But there was no intention to overrule the prior decisions cited in the dissenting opinion of Mr. Justice Harlan, as appears from subsequent cases.

In *Brennan* v. *Titusville*, 153 U. S. 289, 306, 14 Sup. Ct. 829, 834 (38 L. Ed. 719), Mr. Justice Brewer says: "The case of *Ficklen* v. *Shelby County*, 145 U. S. 1, 12 Sup. Ct. 810, 36 L. Ed. 601, is no departure from the rule of decision so firmly established by the prior cases. At least no departure was intended, though, as shown by the division of the court, and by the dissenting opinion of Mr. Justice Harlan, the case was near the boundary line of the State's power."

In *Stockard* v. *Morgan*, 185 U. S. 27, 35, 22 Sup. Ct. 576, 580 (46 L. Ed. 785), the court, after making quotations from the *Ficklen Case*, says: "From these extracts from the opinion it is seen that a material fact in the case was that Ficklen had taken out a general and unrestricted license to do business as a broker, and he was thereby authorized to do any and all kinds of commission business, and therefore became liable to pay the privilege tax exacted. Although Ficklen's principals happened, in the year 1887, to be wholly nonresidents, the fact might have been otherwise, as was stated by the Chief Justice, because his business was not confined to transactions for nonresidents."

The court then, in effect, declares what was meant in the *Ficklen Case* by engaging in "general business," for it says: "In this case (*Stockard* v. *Morgan*) the complainants    *    *    *    did no business for a general pub-

lic." That is to say, in the *Ficklen Case* the license was to do business for anyone, resident or nonresident, by whom business was tendered the public generally, and not merely for definite principals who were nonresidents of the State. In such case it was immaterial, after the license period had expired, that all of the principals for the license period year happened to be nonresidents.

In *Crew Levick Co.* v. *Pennsylvania*, 245 U. S. 292, 38 Sup. Ct. 126, 62 L. Ed. 295, the court, speaking of the *Ficklen Case*, says: "Undoubtedly that case is near the border line," and calling attention to the question left undecided, and to the fact that the tax imposed in the *Ficklen Case* was not directly upon the business itself or to the volume thereof, but upon the amount of the commissions earned by the brokers, says: "For these and other reasons the case has been deemed exceptional."

In view of the "exceptional" holding in the *Ficklen Case*, as well as the reservation hereinbefore quoted, we do not regard the case as authority for the Commonwealth in the instant case.

[4] It is asserted in the petition that one of the evidences that the applicant is doing a "general business" is that it "does not act for any particular company, and is not limited as to the number of owners whose product it may sell." It is immaterial how many nonresident principals an agent represents if they are all in the same category. The business in which the agent engages is not made a "general business" by the fact that the agent represents more than one principal. If the principals are all nonresidents and the agent is engaged exclusively in selling goods belonging to them in another State for the purpose of introducing them into the State in which the sale is made, the latter State has no power to require the agent to pay a license tax to con-

duct such sales.    *Stockard* v. *Morgan*, 185 U. S. 27, 22
Sup. Ct. 576, 46 L. Ed. 785; *Robbins* v. *Shelby County*
*Taxing District*, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed.
694; *Adkins* v. *Richmond*, 98 Va. 91, 34 S. E. 967,
47. L. R. A. 583, 81 Am. St. Rep. 705.

*Hopkins* v. *United States*, 171 U. S. 578, 19 Sup. Ct.
40, 43 L. Ed. 290, also relied on by the Commonwealth,
arose under the antitrust law and involved no question
of taxation, but certain passages are quoted from the
opinion as sustaining the present contention of the Com-
monwealth.    The case did not involve the selling in the
State of Kansas cattle located out of the State at the
time of the sale.    The case did not involve any ques-
tion of interstate commerce, and it is sufficient to refer
to the review of the case by this court in *Adkins* v.
*Richmond*, 98 Va. 91, 34 S. E. 967, 47 L. R. A. 583, 81
Am. St. Rep. 705, where it is said, amongst other
things: "It will be seen running all through the opinion
of the court that stress was laid upon the fact that the
business of the members was wholly concerned with
buying and selling live stock after their arrival at Kan-
sas City, and that the distinction made in the cases
heretofore cited, between the sale or offer to sell in one
State property which is situated in another State, and
the sale of property after it has been brought into the
State in which the sale is negotiated, was kept steadily
in view; the one being interstate commerce and subject
only to the regulations of Congress, and the other being
domestic, and subject to legislation by the State."

It is unnecessary to discuss *Ware & Leland* v. *Ala-*
*bama*, 209 U. S. 405, 28 Sup. Ct. 526, 52 L. Ed. 855, 14
Ann. Cas. 1031, also relied on by the Commonwealth,
further than to say that it involved a license assessed
upon persons "buying and selling futures for specula-
tion or on a commission."    The following extract from

the opinion of the court shows that it does not sustain the position of the Commonwealth in the case under consideration:

"The appellants are brokers who take orders and transmit them to other States for the purchase and sale of grain or cotton upon speculation. They are, in no just sense, common carriers of messages, as are the telegraph companies. For that part of the transactions, merely speculative and followed by no actual delivery, it cannot be fairly contended that such contracts are the subject of interstate commerce; and concerning such of the contracts for purchase for future delivery, as result in actual delivery of the grain or cotton, the stipulated facts show that when the orders transmitted are received in the foreign State the property is bought in that State and there held for the purchaser. The transaction was thus closed by a contract completed and executed in the foreign State, although the orders were received from another State. When the delivery was upon a contract of sale made by the broker, the seller was at liberty to acquire the cotton in the market where the delivery was required or elsewhere. He did not contract to ship it from one State to the place of delivery in another State. And though it is stipulated that shipments were made from Alabama to the foreign State in some instances, that was not because of any contractual obligation to do so. In neither class of contracts, for sale or purchase, was there necessarily any movement of commodities in interstate traffic, because of the contracts made by the brokers.

"These contracts are not, therefore, the subjects of interstate commerce, any more than in the insurance cases, where the policies are ordered and delivered in another State than that of the residence and office of the company. The delivery, when one was made, was

not because of any contract obliging an interstate shipment, and the fact that the purchaser might thereafter transmit the subject matter of purchase by means of interstate carriage did not make the contracts as made and executed the subjects of interstate commerce."

In the instant case coal located in one State was sold for actual delivery in another State, and the contracts between the applicant and the purchasers show this on their face. All of the sale contracts are of like tenor, and one of them is copied into the record. It shows that it was made by the applicant as agent, and on behalf of the companies and collieries mentioned on the face of the contract, that the sale was "f. o. b. cars at the mines," and for the "requirement of the Chesapeake Western Railway, Silex, Va." There is no evidence that any of these companies or collieries was located in Virginia. On the contrary, so far as mentioned in the parol evidence, they appear to be located in West Virginia. The sales were all *bona fide* sales of a tangible product, and actual delivery in kind was contracted for and expected, and this could not be accomplished except by the transportation of the coal from the mines in West Virginia to the purchaser at the place of delivery in another State. They sold no coal to purchasers in the State in which the mine was located.

The facts in *Phillips & Co.* v. *Everett—In re Springfield Realty Co.*, 262 Fed. 341, are so unlike those in the case in judgment as not to require consideration.

The case of *Walton & Carr* v. *City Council of Augusta*, 104 Ga. 757, 30 S. E. 964, is said by counsel to be on "all fours" with the case at bar. We do not so understand it. They are quite similar to the facts in the *Ficklen Case*, but far from being "on all fours" with the facts in the instant case. The following statement of facts, taken from the opinion, shows the difference in the facts of the two cases:

"An analysis of this evidence leaves little room for doubt as to the exact nature of the business conducted by the plaintiffs in error.    The simple truth of the matter is, they are conducting, on their own account, a commercial street brokerage.    'Interstate commerce' is only indirectly and remotely involved.    It is evident that they frequently obtain orders without knowing at the time with whom the same will be placed.    Certainly, in such instances, they have no nonresident principal.    Their 'correspondents' are simply nonresident dealers, with whom they themselves place orders when it suits them to do so.    They are in no fair sense 'agents' for conducting business in behalf of dealers residing beyond the limits of this State.    They candidly admit that, if a purchaser inquires for whom they are selling, the shipment must come from the dealer named as seller, but, if no such inquiry is made, they have the right to place the order received with any dealer they may select; and in view of the fact that they sometimes get $1.50 per car from one correspondent, and at the same time $2.00 per car for the same class of goods from another, it is to be presumed that in placing a particular order they will be governed by their own interest, and not that of a supposed principal.    Again, they resell rejected goods after their arrival in this State, and surely this is not 'interstate commerce' although such goods may remain 'in the hands of the railroads as the property of the foreign shipper until sold and delivered.' "    The court, amongst other things, said:  "The case of *Stratford* v. *City Council of Montgomery*, 110 Ala. 619, 20 So. 127, is easily distinguishable from the case at bar, for it appears in that case that though Stratford represented several nonresident principals, he did so under special agreements made with them separately, and *before any orders were solicited or*

*received.*" (Italics supplied.) The intimation is plain that its decision would have been different if the agreements with the nonresident principals had been made before any orders were solicited or received. If this is not the proper interpretation of that case, then it is in conflict with the cases from the Supreme Court of the United States, and we are unable to follow it.

Finally, it is contended for the Commonwealth that if the tax upon the applicant affects interstate Commerce at all it does so indirectly and remotely, and *U. S. Fidelity & Guaranty Co.* v. *Kentucky,* 231 U. S. 394, 399, 34 Sup. Ct. 122, 124 (58 L. Ed. 283), is cited for the proposition that "to warrant interference with the exercise of the taxing power of the State on the ground that it obstructs or hampers interstate commerce it must appear that the burden is direct and substantial." This quotation is the concluding paragraph of an opinion dealing with a state of facts bearing no resemblance to the instant case. The tax there in question was a license tax upon the agent of a foreign corporation that was compiling a list of selected attorneys. It is said in the opinion the "plaintiff in error is a corporation of the State of Maryland, and is engaged in the publication and distribution of selected attorneys in the United States. With the several attorneys upon the list, plaintiff in error has an arrangement by which, in consideration of fee paid by them to it, their names are inserted, and plaintiff in error guarantees to merchants and other persons sending claims to the attorneys that they will promptly and faithfully pay over all moneys collected. It furnishes the list of attorneys to business men and merchants throughout the United States. * * * * The attorneys do not make reports to the plaintiff in error, but send them direct to the person or firm making the inquiry. The attorneys are not the

agents of either buyer or seller, in the sense that any goods are bought or sold through their agency. * * * They do not sell or offer to sell any goods, nor deliver or offer to deliver any, and have nothing to do with buying, selling, transporting, delivering or handling any merchandise. * * * There is no direct or necessary connection between the service performed by plaintiff in error through its representatives and the making or fulfilment of commercial contracts." Upon this state of facts the court upheld the license tax imposed by the State of Kentucky and concluded its opinion with the language above quoted. But the court was careful to distinguish and uphold its former holdings in *McCall* v. *California*, 136 U. S. 104, 10 Sup. Ct. 881, 34 L. Ed. 392; *International Text-Book Co.* v. *Pitt*, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; and *Robbins* v. *Shelby County*, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694.

[5] Counsel for the Commonwealth also rely upon *Hopkins* v. *United States*, *supra*, to sustain the position that the tax must be a direct tax on interstate commerce and quote the following language: "The State may levy a tax upon the earnings of a commission merchant which were realized out of the sale of property belonging to nonresidents, and such a tax is not one upon interstate commerce because it affects it only incidentally and remotely, although certainly. *Ficklen* v. *Shelby County Taxing District*, 145 U. S. 1, 12 Sup. Ct. 810, 36 L. Ed. 601." The tax sought to be imposed in the instant case is not an income tax, but a license tax for the privilege of doing business in this State, based upon gross commissions received from all sources, and these sources are wholly subject of interstate commerce. Whether or not this State can impose an

4

income tax on the applicant is not involved in this controversy, and we express no opinion on the subject. Every license tax upon interstate commerce, whether it be large or small, is an interference with that commerce, and in its very nature is direct and substantial. A license tax upon the agent of a nonresident owner of goods in interstate commerce, is a tax upon the goods and a burden upon and an interference with interstate commerce, and hence not within the power of the States. *Welton* v. *Missouri*, 91 U. S. 275, 23 L. Ed. 347; *Leloup* v. *Mobile*, 127 U. S. 640, 8 Sup. Ct. 1380, 32 L. Ed. 311; *Robbins* v. *Shelby County*, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694; *Brennan* v. *Titusville*, 153 U. S. 269, 14 Sup. Ct. 829, 38 L. Ed. 719; *Stockard* v. *Morgan*, 185 U. S. 27, 22 Sup. Ct. 576, 46 L. Ed. 785; *Adkins* v. *Richmond*, 98 Va. 91, 34 S. E. 967, 47 L. R. A. 583, 81 Am. St. Rep. 705.

[6] The nature of the business in which the appellant was engaged, and the object and intent of both applicant and the coal operators can best be gathered from their contracts, from which it appears that the operator constituted the applicant its sole agent to sell the whole output of its mine at prices and on terms to be determined by the operator, and to pay to the applicant the expenses of inspection at the mines and a commission of ten per cent on sales of coal made by it as such agent. The applicant agreed to use its best efforts to sell the coal at prices named by the operators and also to use every effort to get from the railroad companies operator's due proportion of tonnage. The applicant also guaranteed payment for all coal sold by it as such agent and to take charge of the inspection, shipments and delivery of said coal and the collection of bills therefor; to pay cost of such inspection, to be reimbursed as before provided, and all freights, tolls and other charges in

connection with such shipment and delivery, and to
pay the party of the first part on the 14th day of each
and every month during the continuance of this agree-
ment, the proceeds of all coal delivered for its account
and passing the weigh,scales of the Norfolk and West-
ern Railway Company, or other railway companies,
during the next preceding calendar month.   It also
agreed that all expenses connected with the selling of
said coal should be borne by the party· of the second
part.   The applicant also agreed to advance to the
operator on the 14th of each month on all coal of the
operator weighed but undelivered during the next pre-
ceding month, the same amount per ton paid by it for
coal delivered during any such month.   The contract
was for two years and thereafter from year to year until
terminated by either party by three months written
notice prior to April 1st.   There are a number of these
contracts of like tenor and effect with different opera-
tors all in West Virginia except one which was in Ken-
tucky.   The mutual advantages to the parties under
these contracts are too manifest to need enumeration.
The method of operating under them has already been
pointed out.   Thousands of tons, in carload lots, have
been sold under them each year.   The coal has been
sold in each instance while situated in West Virginia or
Kentucky and shipped thence in unbroken bulk to des-
tination in Virginia, North Carolina, South Carolina or
Georgia, the territory covered by the Virginia agency.
The applicant does not mine any coal, nor lease, nor
operate any coal mines, nor have any coal storage yards
in the State, nor retail any coal in the State; nor is any
coal sold by it located in this State at the time of sale;
nor does it represent any coal operator whose mine is
located in this State.   Its agency in this State is wholly
a sales agency of coal located in another State at the

time of its sale, and the sales and deliveries are conducted in the manner hereinbefore indicated.    This is interstate commerce.    As said by Mr. Justice Harlan in *Ficklen* v. *Shelby County*, 145 U. S. 1, 25, 12 Sup. Ct. 810, 813 (36 L. Ed. 601): "The negotiation of sales of goods which are in another State, for the purpose of introducing them into the State in which the negotiation is made, is interstate commerce."    The same thing, in effect, has been said by the Supreme Court of the United States in a number of the cases we have cited. *Robbins* v. *Shelby County, supra; Brennan* v. *Titusville, supra.*    In *Roselle* v. *Commonwealth*, 110 Va. 235, 65 S. E. 526, it is said:    "The test which seems to determine whether the transaction is to be regarded as belonging to intra or interstate commerce is whether the property which is the subject of sale is within the jurisdiction of the State at the time the sale is made."    It is doubtful if the test can be better phrased than is done by Mr. Justice Harlan in the quotation above.

We have reviewed all of the cases cited for the Commonwealth and have no doubt about the fact that the business in which the defendant in error was engaged is not subject to tax in this State.    Undoubtedly it is doing business in this State, and its business is a profitable one, but the business in which it is engaged is one that is not subject to State taxation.

We find no error in the judgment of the trial court and it will accordingly be affirmed.

*Affirmed.*