BOYNTON *v.* VIRGINIA.

No. 7.   Argued October 12, 1960.—Decided December 5, 1960.

*Thurgood Marshall* argued the cause for petitioner. With him on the brief were *Martin A. Martin, Clarence W. Newsome, Jack Greenberg, Louis H. Pollak* and *Constance Baker Motley.*

*Walter E. Rogers,* Special Assistant to the Attorney General of Virginia, argued the cause for respondent. With him on the brief were *A. S. Harrison, Jr.,* Attorney General of Virginia, and *R. D. McIlwaine III,* Assistant Attorney General.

*Solicitor General Rankin, Assistant Attorney General Tyler, Philip Elman, Harold H. Greene* and *David Rubin* filed a brief for the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

The basic question presented in this case is whether an interstate bus passenger is denied a federal statutory or constitutional right when a restaurant in a bus terminal used by the carrier along its route discriminates in serving food to the passenger solely because of his color.

Petitioner, a Negro law student, bought a Trailways bus ticket from Washington, D. C., to Montgomery, Alabama. He boarded a bus at 8 p. m. which arrived at Richmond, Virginia, about 10:40 p. m. When the bus pulled up at the Richmond "Trailways Bus Terminal" the bus driver announced a forty-minute stopover there. Petitioner got off the bus and went into the bus terminal to get something to eat. In the station he found a restaurant in which one part was used to serve white people and one to serve Negroes. Disregarding this division, petitioner sat down on a stool in the white section. A waitress asked him to move over to the other section where there were "facilities" to serve colored people. Petitioner told her he was an interstate bus passenger, refused to move and ordered a sandwich and tea. The waitress then brought the Assistant Manager, who "instructed" petitioner to "leave the white portion of the restaurant and advised him he could be served in the colored portion." Upon petitioner's refusal to leave an officer was called and petitioner was arrested and later tried, convicted and

fined ten dollars in the Police Justice's Court of Richmond on a charge that he *"Unlawfully* did remain on the premises of the Bus Terminal Restaurant of Richmond, Inc. after having been forbidden to do so" by the Assistant Manager. (Emphasis supplied.) The charge was based on § 18–225 of the Code of Virginia of 1950, as amended (1958), which provides in part:

> "If any person shall *without authority of law* go upon or remain upon the lands or premises of another, after having been forbidden to do so by the owner, lessee, custodian or other person lawfully in charge of such land, . . . he shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than one hundred dollars or by confinement in jail not exceeding thirty days, or by both such fine and imprisonment." (Emphasis supplied.)

Petitioner appealed his conviction to the Hustings Court of Richmond, where, as in the Police Court, he admitted that he had remained in the white portion of the Terminal Restaurant although ordered not to do so. His defense in both courts was that he had a federal right as an interstate passenger of Trailways to be served without discrimination by this restaurant used by the bus carrier for the accommodation of its interstate passengers. On this basis petitioner claimed he was on the restaurant premises lawfully, not "unlawfully" as charged, and that he remained there with, not "without authority of law." His federal claim to this effect was spelled out in a motion to dismiss the warrant in Hustings Court, which was overruled both before and after the evidence was heard. Pointing out that the restaurant was an integral part of the bus service for interstate passengers such as petitioner, and asserting that refusal to serve him was a discrimination based on color, the motion to dismiss charged

that application of the Virginia law to petitioner violated the Interstate Commerce Act and the Equal Protection, Due Process and Commerce Clauses of the Federal Constitution. On appeal the Virginia Supreme Court held that the conviction was "plainly right" and affirmed without opinion, thereby rejecting petitioner's assignments of error based on the same grounds of discrimination set out in his motion to dismiss in Hustings Court but not specifically charging that the discrimination violated the Interstate Commerce Act. We think, however, that the claims of discrimination previously made under the Act are sufficiently closely related to the assignments that were made to be considered within the scope of the issues presented to the State Supreme Court. We granted certiorari because of the serious federal questions raised concerning discrimination based on color. 361 U. S. 958.

The petition for certiorari we granted presented only two questions: first, whether the conviction of petitioner is invalid as a burden on commerce in violation of Art. I, § 8, cl. 3 of the Constitution; and second, whether the conviction violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Ordinarily we limit our review to the questions presented in an application for certiorari. We think there are persuasive reasons, however, why this case should be decided, if it can, on the Interstate Commerce Act contention raised in the Virginia courts. Discrimination because of color is the core of the two broad constitutional questions presented to us by petitioner, just as it is the core of the Interstate Commerce Act question presented to the Virginia courts. Under these circumstances we think it appropriate not to reach the constitutional questions but to proceed at once to the statutory issue.

The Interstate Commerce Act, as we have said, uses language of the broadest type to bar discriminations of all kinds. *United States* v. *Baltimore & Ohio R. Co.,* 333

U. S. 169, 175, and cases cited. We have held that the Act forbids railroad dining cars to discriminate in service to passengers on account of their color. *Henderson* v. *United States,* 339 U. S. 816; see also *Mitchell* v. *United States,* 313 U. S. 80, 97.

Section 216 (d) of Part II of the Interstate Commerce Act, 49 U. S. C. § 316 (d), which applies to motor carriers, provides in part:

> "It shall be unlawful for any common carrier by motor vehicle engaged in interstate or foreign commerce to make, give, or cause any undue or unreasonable preference or advantage to any particular person . . . in any respect whatsoever; or to subject any particular person . . . to any unjust discrimination or any unjust or unreasonable prejudice or disadvantage in any respect whatsoever . . . ."

So far as relevant to our problem, the provisions of § 216 (d) quoted are the same as those in § 3 (1) of the Act, 49 U. S. C. § 3 (1), except that the latter refers to railroads as defined in Part I of the Act instead of motor carriers as defined in Part II. Section 3 (1) was the basis for this Court's holding in *Henderson* v. *United States, supra,* that it was an "undue or unreasonable prejudice" under that section for a railroad to divide its dining car by curtains, partitions and signs in order to separate passengers according to race. The Court said that under § 3 (1) "[w]here a dining car is available to passengers holding tickets entitling them to use it, each such passenger is equally entitled to its facilities in accordance with reasonable regulations." *Id.,* 339 U. S., at 824. The *Henderson* case largely rested on *Mitchell* v. *United States, supra,* which pointed out that while the railroads might not be required by law to furnish dining car facilities, yet if they did, substantial equality of treatment of persons traveling

under like conditions could not be refused consistently with § 3 (1). It is also of relevance that both cases upset Interstate Commerce Commission holdings, the Court stating in *Mitchell* that since the "discrimination shown was palpably unjust and forbidden by the Act" no room was left for administrative or expert judgment with reference to practical difficulties. *Id.*, 313 U. S., at 97.

It follows from the *Mitchell* and *Henderson* cases as a matter of course that should buses in transit decide to supply dining service, discrimination of the kind shown here would violate § 216 (d). Cf. *Williams* v. *Carolina Coach Co.*, 111 F. Supp. 329, aff'd, 207 F. 2d 408, and *Keys* v. *Carolina Coach Co.*, 64 M. C. C. 769. Although this Court has not decided whether the same result would follow from a similar discrimination in service by a restaurant in a railroad or bus terminal, we have no doubt that the reasoning underlying the *Mitchell* and *Henderson* cases would compel the same decision as to the unlawfulness of discrimination in transportation services against interstate passengers in terminals and terminal restaurants owned or operated or controlled by interstate carriers. This is true as to railroad terminals because they are expressly made carriers by § 1 (3)(a) of the Act,[1] 49 U. S. C. § 1 (3)(a), and as to bus terminals because § 203 (a)(19) of the Act, 49 U. S. C. § 303 (a)(19), specifically includes interstate transportation facilities and property operated or controlled by a

---

[1] See *National Association for the Advancement of Colored People* v. *St. Louis-S. F. R. Co.*, 297 I. C. C. 335, 347–348, in which the Interstate Commerce Commission held that a railroad terminal discriminates in violation of § 3 (1) if it maintains waiting rooms for the exclusive use of Negroes. The Commission regarded assignment to accommodations or facilities in a railroad terminal solely on the basis of race as an implication of inherent inferiority and found it to be unreasonable.

motor carrier within the definition of the "services" and "transportation" to which the motor carrier provisions of the Act apply.[2]

Respondent correctly points out, however, that, whatever may be the facts, the evidence in this record does not show that the bus company owns or actively operates or directly controls the bus terminal or the restaurant in it. But the fact that § 203 (a) (19) says that the protections of the motor carrier provisions of the Act extend to "include" facilities so operated or controlled by no means should be interpreted to exempt motor carriers from their statutory duty under § 216 (d) not to discriminate should they choose to provide their interstate passengers with services that are an integral part of transportation through the use of facilities they neither own, control nor operate. The protections afforded by the Act against discriminatory transportation services are not so narrowly limited. We have held that a railroad cannot escape its statutory duty to treat its shippers alike either by use of facilities it does not own or by contractual arrangement with the owner of those facilities. *United States* v. *Baltimore & Ohio R. Co., supra.* And so here, without regard to contracts, if the bus carrier has volunteered to make terminal and restaurant facilities and services available to its interstate passengers as a regular part of their transportation, and the terminal and restaurant have acquiesced and cooperated in this undertaking, the terminal and restaurant must perform these services without discriminations prohibited by the Act. In the performance of these services

---

[2] "The 'services' and 'transportation' to which this chapter applies include all vehicles operated by, for, or in the interest of any motor carrier irrespective of ownership or of contract, express or implied, together with all facilities and property operated or controlled by any such carrier or carriers, and used in the transportation of passengers or property in interstate or foreign commerce or in the performance of any service in connection therewith."

under such conditions the terminal and restaurant stand in the place of the bus company in the performance of its transportation obligations. Cf. *Derrington* v. *Plummer,* 240 F. 2d 922, 925–926, cert. denied, 353 U. S. 924. Although the courts below made no findings of fact, we think the evidence in this case shows such a relationship and situation here.

The manager of the restaurant testified that it was not affiliated in any way with the Trailways Bus Company and that the bus company had no control over the operation of the restaurant, but that while the restaurant had "quite a bit of business" from local people, it was primarily or partly for the service of the passengers on the Trailways bus. This last statement was perhaps much of an understatement, as shown by the lease agreement executed in writing and signed both by the "Trailways Bus Terminal, Inc.," as lessor, and the "Bus Terminal Restaurant of Richmond, Inc.," as lessee. The first part of the document showed that Trailways Terminal was then constructing a "bus station" with built-in facilities "for the operation of a restaurant, soda fountain, and news stand.". Terminal covenanted to lease this space to Restaurant for its use; to grant Restaurant the exclusive right to sell foods and other things usually sold in restaurants, newsstands, soda fountains and lunch counters; to keep the terminal building in good repair and to furnish certain utilities. Restaurant on its part agreed to use its space for the sale of commodities agreed on at prices that are "just and reasonable"; to sell no commodities not usually sold or installed in a bus terminal concession without Terminal's permission; to discontinue the sale of any commodity objectionable to Terminal; to buy, maintain, and replace equipment subject to Terminal's approval in writing as to its quality; to make alterations and additions only after Terminal's written consent and approval; to make no "sales on buses

operating in and out said bus station" but only "through the windows of said buses"; to keep its employees neat and clean; to perform no terminal service other than that pertaining to the operation of its restaurant as agreed on; and that neither Restaurant nor its employees were to "sell transportation of any kind or give information pertaining to schedules, rates or transportation matters, but shall refer all such inquiries to the proper agents of" Terminal. In short, as Terminal and Restaurant agreed, "the operation of the restaurant and the said stands shall be in keeping with the character of service maintained in an up-to-date, modern bus terminal."

All of these things show that this terminal building, with its grounds, constituted one project for a single purpose, and that was to serve passengers of one or more bus companies—certainly Trailways' passengers. The restaurant area was specifically designed and built into the structure from the beginning to fill the needs of bus passengers in this "up-to-date, modern bus terminal." Whoever may have had technical title or immediate control of the details of the various activities in the terminal, such as waiting-room seating, furnishing of schedule information, ticket sales, and restaurant service, they were all geared to the service of bus companies and their passengers, even though local people who might happen to come into the terminal or its restaurant might also be accommodated. Thus we have a well-coordinated and smoothly functioning plan for continuous cooperative transportation services between the terminal, the restaurant and buses like Trailways that made stopovers there. All of this evidence plus Trailways' use on this occasion shows that Trailways was not utilizing the terminal and restaurant services merely on a sporadic or occasional basis. This bus terminal plainly was just as essential and necessary, and as available for that matter, to passengers and carriers like Trailways that used it, as though such carriers

had legal title and complete control over all of its activities.[3]  Interstate passengers have to eat, and the very terms of the lease of the built-in restaurant space in this terminal constitute a recognition of the essential need of interstate passengers to be able to get food conveniently on their journey and an undertaking by the restaurant to fulfill that need.  Such passengers in transit on a paid interstate Trailways journey had a right to expect that this essential[4] transportation food service voluntarily provided for them under such circumstances would be rendered without discrimination prohibited by the Interstate Commerce Act.  Under the circumstances of this case, therefore, petitioner had a federal right to remain in the white portion of the restaurant.  He was there under "authority of law"—the Interstate Commerce Act—and it was error for the Supreme Court of Virginia to affirm his conviction.

Because of some of the arguments made here it is necessary to say a word about what we are not deciding.  We are not holding that every time a bus stops at a wholly independent roadside restaurant the Interstate Commerce Act requires that restaurant service be supplied in harmony with the provisions of that Act.  We decide only this case, on its facts, where circumstances show that the terminal and restaurant operate as an integral part of the

---

[3] Cf. *Atchison, Topeka & S. F. R. Co.*, 135 I. C. C. 633, 634–635, in which the Commission held that railroad-owned hotels and restaurants used for railroad passengers and employees, and as an incident to the operation and management of the railroad, should be accorded a common-carrier classification.

[4] Because the evidence shows that this terminal restaurant was utilized as an integral part of the transportation of interstate passengers, we need not decide whether discrimination on the basis of color by a bus terminal lessee restaurant would violate § 216 (d) in the absence of such circumstances. Cf. *National Association for the Advancement of Colored People* v. *St. Louis-S. F. R. Co., supra*, at 343–344.

bus carrier's transportation service for interstate passengers. Under such circumstances, an interstate passenger need not inquire into documents of title or contractual arrangements in order to determine whether he has a right to be served without discrimination.

The judgment of the Supreme Court of Virginia is reversed and the cause is remanded to that Court for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE CLARK joins, dissenting.

Neither in the Supreme Court of Appeals of Virginia nor in his petition for certiorari or in his brief on the merits in this Court did petitioner challenge the judgment on the ground that it was obtained in violation of the Interstate Commerce Act. I therefore respectfully submit that, under our rules and decisions, no such question is presented or open for consideration here.[1] But even if the Court properly may proceed, as it has proceeded, to decide the case under that Act, and not at all on the constitutional grounds solely relied on by petitioner,[2] I must say, with all deference, that the facts in this record do not show that petitioner was convicted of trespass in violation of that Act.

For me, the decisive question in this case is whether petitioner had a legal right to remain in the restaurant

---

[1] See our Rules 23 (1)(c) and 40 (1)(d)(1); *Lawn v. United States,* 355 U. S. 339, 362, n. 16, and cases cited.

[2] The only grounds relied on by petitioner in the Supreme Court of Appeals of Virginia and in his petition for certiorari and brief on the merits in this Court were that his conviction is invalid as an undue burden on interstate commerce in violation of Art. I, § 8, cl. 3, and also violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution.

involved after being ordered to leave it by the proprietor. If he did not have that legal right, however arising, he was guilty of trespass and, unless proscribed by some federal law, his conviction therefor was legally adjudged under § 18–225 of the Code of Virginia.[3]

If the facts in this record could fairly be said to show that the restaurant was a facility "operated or controlled by any [motor] carrier or carriers, and used in the transportation of passengers or property in interstate or foreign commerce," § 203 (a)(19) of Part II of the Interstate Commerce Act, 49 U. S. C. § 303 (a)(19), I would agree that petitioner had a legal right to remain in and to insist on service by that restaurant and, hence, was not guilty of trespass in so remaining and insisting though in defiance of the manager's order to leave, for § 216 (d) of the Act, 49 U. S. C. § 316 (d), makes it unlawful for a motor carrier while engaged in interstate commerce "to subject any particular person . . . to any unjust discrimination," and this Court has held that any discrimination by a carrier against its interstate passenger on account of his color in the use of its dining facilities is an unjust discrimination. *Henderson* v. *United States,* 339 U. S. 816. Cf. *Mitchell* v. *United States,* 313 U. S. 80.

But I respectfully submit that those are not the facts shown by this record. As I read it, there is no evidence in this record even tending to show that the restaurant was "operated or controlled by any such carrier," directly or indirectly. Instead, all of the relevant evidence, none

---

[3] Section 18–225 of the Code of Virginia, in relevant part, provides:

"If any person shall without authority of law go upon or remain upon the lands or premises of another, after having been forbidden to do so by the owner, lessee, custodian or other person lawfully in charge of such land, . . . he shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than one hundred dollars or by confinement in jail not exceeding thirty days, or by both such fine and imprisonment."

of which was contradicted, shows that the restaurant was owned and controlled by a noncarrier who alone operated it as a local and private enterprise. The evidence was very brief, consisting only of an exhibit (a lease) and the testimony of the assistant manager of the restaurant, of a police officer and of petitioner—all, except the exhibit, being contained on 10 pages of the printed record. The lease is in the usual and common form and terms. By it, the owner of the building, Trailways Bus Terminal, Inc., a Virginia corporation, as lessor, demised to the restaurant company, Bus Terminal Restaurant of Richmond, Inc., a Virginia corporation, as lessee, certain described "space" in the lessor's bus station building in Richmond, Virginia, "for use by Lessee as a restaurant, lunchroom, soda fountain and news stand," for a term of five years from December 2, 1953 (with an option in the lessee to renew, on the same terms, for an additional five-year term), at an annual rental of $30,000 (payable in equal monthly installments) plus 12% of lessee's gross receipts from the demised premises in excess of $275,000 (payable at the end of each year).[4]

---

[4] Under other provisions of the lease, the lessee covenanted, in substance, that it would acquire and install in the leased space, at its own expense, all things, including plumbing and wiring, which may be reasonably necessary to the equipment and operation of the restaurant; to provide and pay for all gas and electric current, except for overhead lights; to keep the premises and employees neat and clean and to operate the restaurant "in keeping with the character of service maintained in an up-to-date, modern bus terminal"; that it would not keep any coin-controlled machines or sell intoxicants on the demised premises nor make "any sales on buses operating in and out [of] said bus station"; that it would "comply with all the ordinances of the City of Richmond, and the laws of the United States and the State of Virginia in respect to the conduct of business of Lessee on the demised premises"; to take good care of the premises, and to surrender them at the end of the term in the same condition as when received "ordinary wear and tear excepted."

There is not a word of evidence that any carrier had any interest in or control over the lessee or its restaurant. Nor is there any suggestion in the record that the lease or the lessee's restaurant operations under it were anything other than bona fide and for a legitimate and private business purpose. Indeed, there is not a word of evidence in the record tending to show that any carrier even had any interest in or control over the lessor corporation that owned the building. In truth, the record does not even show the name of the carrier on which petitioner was traveling or identify it other than as "Trailways."[5] On

---

[5] Obviously recognizing these glaring deficiencies in the evidence, counsel for petitioner and for the Government, as *amicus curiae,* have submitted with their briefs in this Court copies of certain Annual Reports of Virginia Stage Lines, Inc. (which probably was the carrier on which petitioner was traveling), Carolina Coach Company, and of Trailways Bus Terminal, Inc. (the owner of the building and lessor of the space occupied by the lessee's restaurant), to the State Corporation Commission of Virginia, purporting to show that those companies were doing business in Virginia in 1958 and 1959, and a copy of certain pages of the Annual Report filed by Virginia Stage Lines, Inc., with the Interstate Commerce Commission for the year 1959, purporting to show that the capital stock of Trailways Bus Terminal, Inc., was owned in equal parts by Virginia Stage Lines, Inc., and Carolina Coach Company. But none of those documents was put in evidence nor brought to the attention of the Supreme Court of Appeals of Virginia, and it appears, as contended by Virginia, that the Virginia court could not take judicial notice of those documents. See §§ 8–264 and 8–266 of the Code of Virginia; *Commonwealth* v. *Castner,* 138 Va. 81, 121 S. E. 894; *Sisk* v. *Town of Shenandoah,* 200 Va. 277, 105 S. E. 2d 169; *Bell* v. *Hagmann,* 200 Va. 626, 107 S. E. 2d 426. In the light of these facts the proffered documents cannot be considered here. *Lawn* v. *United States,* 355 U. S. 339, 354; *Wolfe* v. *North Carolina,* 364 U. S. 177. But even if those documents could be considered here, they would not aid petitioner, for they do not purport to show that any carrier had any interest in or control over the restaurant involved or in or over Bus Terminal Restaurant of Richmond, the company that owned and operated the restaurant.

the other hand, the assistant manager of the restaurant testified, without suggestion of contradiction, that "[t]he company that operates the restaurant is not affiliated in any way with the bus company," and that "[t]he bus company has no control over the operation of the restaurant." There was simply no evidence to the contrary.

The Court seems to agree that "[r]espondent correctly points out [that] . . . the evidence in this record does not show that the bus company owns or actively operates or directly controls the bus terminal or the restaurant in it." But it seems to hold, as I read its opinion, that a motor carrier's regular "use" of a restaurant, though it be "neither own[ed], control[led] nor operate[d]" by the motor carrier, makes the restaurant a facility "operated or controlled by [the motor] carrier or carriers" within the meaning of § 203 (a)(19) of the Interstate Commerce Act. I must respectfully disagree. To me, it seems rather plain that when Congress, in § 203 (a)(19), said that the " 'services' and 'transportation' " to which Part II of the Act applies shall include "all vehicles . . . together with all facilities and property operated or controlled by any such carrier or carriers, and used in the transportation of passengers or property in interstate or foreign commerce or in the performance of any service in connection therewith," it hardly meant to include a private restaurant, "neither owned, operated nor controlled" by a carrier. Surely such "use" of a private restaurant by a motor carrier as results from stopping and opening its buses in front of or near a restaurant does not make the restaurant a facility "operated or controlled by" the carrier, within the meaning of § 203 (a)(19) or in any true sense. This simple, and I think obvious, principle was recognized and correctly applied by the Commission as recently as November 1955 in *N. A. A. C. P.* v. *St. Louis, S. F. R. Co.*, 297 I. C. C. 335. There, the railroad terminal or station building in

Richmond, Virginia, was owned by Richmond Terminal Railway Company [6]—itself a carrier under § 3 (1) of Part I of the Act—which had leased space in that building to Union News Company for a term of 10 years, but subject to termination at the option of either party on 90 days' notice, for use as a restaurant.[7] In rejecting the contention that the Union News Company's operation of the restaurant on a racially segregated basis violated § 3 (1) of Part I of the Act, the Commission said:

> "*Unless the operation of the lunchrooms can be found to be that of a common carrier* subject to part I of the act, it cannot be regulated under section 3 (1), and we are unable so to find on the facts before us." (Emphasis added.) *Id.*, at 344,

and the Commission concluded:

> "We further find that the operation *by a lessee* (*noncarrier*) of separate lunchroom facilities for white and colored persons in the railway station at Richmond, constitutes a function or service which is not within the jurisdiction of this Commission." (Emphasis added.) *Id.*, at 348.

---

[6] The Richmond Terminal Railway Company was controlled jointly by two railroads—the Richmond, Fredericksburg & Potomac Railway Co. and the Atlantic Coast Line.

[7] The lease involved in that case was evidently similar to the one here. Speaking of that lease, the Commission said:

"The lease is silent as to racial segregation. The terminal has certain powers of supervision for a purpose which may be described as policing. The lessee is obligated to 'comply with the requirements of the Department of Public Health, City of Richmond, and with all other lawful governmental rules and regulations.' The context, however, indicates that this requirement is for the purpose of keeping the premises in a neat, clean, and orderly condition, and does not render the lessee liable for violations of the Interstate Commerce Act." 297 I. C. C., at 343.

470

I would agree with the Court that "if the bus carrier [had] volunteered to make . . . restaurant facilities and services available to its interstate passengers as a regular part of their transportation, and the . . . restaurant [had] acquiesced . . . in this undertaking," the restaurant would then have been bound to serve the carrier's interstate passengers without discrimination. For, in that case, the restaurant would have been made a facility of the carrier, within the meaning of § 203 (a) (19), and § 216 (d) would inhibit both the carrier and the restaurant from discriminating against the carrier's interstate passengers on account of their color, or on any other account, in the use of the restaurant facilities thus provided. *Henderson v. United States, supra.* But that is not this case. As we have shown, there is no evidence in this record that the carrier on which petitioner was traveling, whatever may have been its name, had "volunteered to make . . . restaurant facilities and services available to its interstate passengers" *at this restaurant* "as a regular part of their transportation," or that the proprietor of this restaurant ever "acquiesced" in any such "undertaking." There is no evidence of any agreement, express or implied, between the proprietor of this restaurant and any bus carrier. Instead, the undisputed evidence is that the restaurant was not in any way affiliated with or controlled by any bus carrier. On this evidence, I am unable to find any basis to support a conclusion that this restaurant was in some way made a facility of the bus carrier, or subject to Part II of the Interstate Commerce Act.

For these reasons, I cannot agree on this record that petitioner's conviction of trespass under § 18–225 of the Code of Virginia was had in violation of the Interstate Commerce Act. Since the Court's opinion does not explore the constitutional grounds relied on by petitioner, I refrain from intimating any views on those subjects.